**Scott MONTOYA, Plaintiff,**

**v.**

**ORANGE COUNTY SHERIFF'S DEPARTMENT, Defendant.**

**Case No. SACV 11–1922 JGB (RNBx).**

United States District Court, C.D. California.

Aug. 13, 2013.

John S. Kyle, Kyle Ludwig Harris, Peter Dahlquist, Cooley LLP, San Diego, CA, for Plaintiff.

Michael John Rossiter, W. Leo Haluck, Koeller Nebeker Carlson and Haluck LLP, Irvine, CA, for Defendant.

GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

JESUS G. BERNAL, District Judge.

Before the Court are two motions, a Motion for Summary Judgment ("Def's Mot.," Doc. No. 61) filed by Defendant Orange County Sheriff's Department ("Defendant" or "OCSD") and a Motion for Partial Summary Judgment ("Pl's Mot.," Doc. No. 56) filed by Plaintiff Scott Montoya ("Plaintiff" or "Montoya"). After considering the papers timely fled and the arguments presented at the June 24, 2013 hearing, the Court GRANTS IN PART Defendant's Motion and DENIES Plaintiff's Motion.

## I. BACKGROUND

### A. Procedural History

On December 13, 2011, Plaintiff filed a Complaint against OCSD and an individual, Sandra Hutchens, alleging they discriminated against him on the basis of his service in the United States Marine Corp. and intentionally inflicted emotional distress. (Compl., Doc. No. 1.) On January 4, 2012, OCSD filed a motion to dismiss and a motion to strike. (Doc. Nos. 5, 6.) Instead of opposing the motions, Plaintiff filed a First Amended Complaint. ("FAC," Doc. No. 8.) The FAC asserts a single claim against Defendant OCSD for violation of the Uniform Servicemembers Employment and Reemployment Rights Act ("USERRA") pursuant to 38 U.S.C. § 4311. (FAC ¶¶ 18–20.)

Plaintiff contends OCSD initiated and manipulated multiple personnel investigations against him and eventually terminated him due to a pervasive animus against him due to his service in the Marine Corps and his receipt of the Navy Cross, a medal for his service in Iraq. (FAC ¶ 17.) Plaintiff also alleges that he was the target of service-related harassment from other OCSD deputies and that OCSD failed to investigate or discipline any of the personnel involved. (FAC ¶¶ 12–13.) The FAC also claims that OCSD denied Plaintiff benefits of employment including extending his patrol training, refusing to award him points for military service on his Sergeants' Examination, and refusing to consider his application for the SWAT team. (FAC ¶ 14.)

Defendant answered the FAC on January 27, 2012. (Doc. No. 13.)

### 1. Defendant's Motion for Summary Judgment

On March 1, 2013, Defendant filed its Motion for Summary Judgment. ("Def's Mot.," Doc. Nos. 61, 63.) Defendant's Motion and all supporting declarations and exhibits were filed under seal pursuant to two Protective Orders by Magistrate Judge Block (Doc. Nos. 18, 32) and an Order of this Court (Doc. No. 59). In support of its Motion, Defendant attached:

- Defendant's Statement of Uncontroverted Facts and Conclusions of Law ("Def's SUF," Doc. No. 62);
- Request for Judicial Notice ("Def's RJN," Doc. No. 59);
- Declaration of John P. Donovan ("Donovan Decl.," Doc. No. 64);
- Declaration of Michael J. Rossiter ("Rossiter Decl.," Doc. No. 65);
- Declaration of Richard Himmel ("Himmel Decl.," Doc. No. 66);
- Declaration of Alan Phillips ("Phillips Decl.," Doc. No. 67);
- Declaration of Assistant Sheriff Librado Trujillo ("Trujillo Decl.," Doc. No. 68);
- Declaration of Janet Hayes ("Hayes Decl.," Doc. No. 69);
- Declaration of Sheriff's Investigator Lavinia Vega ("Vega Decl.," Doc. No. 70); and
- Index of Exhibits attaching forty-four numbered exhibits authenticated by the above declarations ("Def's Exhs.," Doc. No. 71)[1]

On March 11, 2013, Plaintiff filed his Opposition to Defendant's Motion. ("Pl's Opp'n," Doc. No. 79.) As noted below, several of the documents filed in support of his opposition were filed under seal. Plaintiff attached:

- Plaintiff's Statement of Genuine Issues ("Pl's SGI," Doc. No. 89)(under seal);
- Plaintiff's Evidentiary Objections ("Pl's Opp'n Obj.," Doc. No. 89) (under seal);
- Declaration of John S. Kyle ("Kyle Decl.," Doc. No. 79–1);

- Declaration of Crag S. Newton ("Newton Opp'n Decl.," Doc. No. 79–2);
- Declaration of Scott Montoya ("Montoya Opp'n Decl.," Doc. No. 79–3);
- Declaration of Willy Aguilar ("Aguilar Decl.," Doc. No. 79–4); and
- Lodgment of Exhibits attaching twenty-eight numbered exhibits[2] ("Pl's Opp'n Exhs.," Doc. No. 79–5), twelve of which were filed under seal (Exhs. 1, 9–11, 13, 15, 19–24, Doc. No. 89) (under seal).

On March 18, 2013, Defendant filed its Reply ("Def's Reply," Doc. No. 80) attaching the following publicly filed documents:

- Declaration of Michael J. Rossiter ("Rossiter Reply Decl.," Doc. No. 80–1);
- Declaration of Robert Taft ("Taft Decl.," Doc. No. 80–2);
- Declaration of Douglas Blackburn ("Blackburn Decl.," Doc. No. 80–3); and
- Declaration of Janet Hayes ("Hayes Reply Decl." Doc. No. 80–4).

### 2. Plaintiff's Motion for Partial Summary Judgment

On March 4, 2013, Plaintiff filed his Motion for Partial Summary Judgment. ("Pl's Mot.," Doc. Nos. 56 (public version), 90 (sealed version).) As indicated below, Plaintiff filed sealed and/or public redacted versions of the documents in support of his Motion:

- Plaintiff's Statement of Undisputed Material Facts and Conclusions of

---

**1.** Due to the volume of evidence filed in support of, in opposition to, and in reply to the two Motions, the Court does not enumerate each attached Exhibit, but describes the documents in the evidentiary citations as needed.

**2.** Exhibit 27, described as a copy of a page from the investigative file for OCSD PI # 02–097A, was not properly attached as an exhibit, the Court therefore does not consider it.

Law ("Pl's SUF," Doc. Nos. 57 (public version), 87 (sealed version));

● Declaration of Scott Montoya ("Montoya Decl.," Doc. No. 56–2);

● Declaration of Craig S. Newton ("Newton Decl.," Doc. No. 56–3); and

● Lodgment of Exhibits attaching thirty-one lettered exhibits ("Pl's Exhs.," Doc. No. 56–4) (public version), thirteen of which were filed under seal (Exhs. E, I, M, N, O, X, Y, Z, AA, BB, DD, EE, Doc. No. 90) (under seal).

On March 11, 2013, Defendant filed its Opposition to Plaintiff's Motion. ("Def's Opp'n," Doc. Nos. 78 (public version), 94 (sealed version).) In support of its Opposition, Defendant filed public and redacted versions of several supporting documents:

● Defendant's Statement of Genuine Disputes of Material Fact ("Def's SGI," Doc. Nos. 78–1 (public version), 95 (sealed version));

● Defendant's Objections to Evidence ("Def's Obj.," Doc. No. 78–2);

● Declaration of Michael J. Rossiter ("Rossiter Opp'n Decl.," Doc. Nos. 78–3 (public version), 93 (sealed version)) attaching fourteen numbered exhibits; and

● Declaration of Richard Himmel ("Himmel Opp'n Decl.," Doc. No. 78–4).

On March 18, 2013, Plaintiff filed his Reply. ("Pl's Reply," Doc. Nos. 82.) Plaintiff included several documents in support of his Reply. The noted attachments were filed under seal:

● Plaintiff's Evidentiary Objections ("Pl's Reply Obj.," Doc. No. 102) (under seal);

● Declaration of Craig S. Newton ("Newton Reply Decl.," Doc. No. 82–1);

● Declaration of Willy Aguilar ("Aguilar Reply Decl.," Doc. No. 82–2); and

● Lodgment of Exhibits ("Pl's Reply Exhs.," Doc. No 82–3) attaching four numbered exhibits, one of which was filed under seal (Exh. 1, Doc. No. 102) (under seal).

### 3. Sealed Documents

As outlined above, the parties filed numerous documents in support of an in opposition to the Motions under seal. On April 23, 2012, the Court noted the strong presumption in favor of access to court records, particularly those filed as part of a summary judgment motion. (*See* "Order 1" at 2, Doc. No. 104) (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir.2006).) Pursuant to this high bar, the Court ordered that the parties submit supplemental briefing stating why the documents filed under seal met the "compelling reasons" standard necessary for non-disclosure of documents filed in conjunction with dispositive motions. (Order 1 at 2.) In the alternative, the Court permitted the parties to resubmit the sealed documents as public filings, redacting only nonmaterial, confidential information. (*Id.*)

On May 6, 2013, Plaintiff refiled redacted versions of Exhibits M, N, O, and EE submitted in support of his Motion, and Exhibit 1 submitted in opposition to Defendant's Motion. (Doc. No. 105.) Plaintiff did not take any position as to whether his remaining documents met the compelling reasons test, and he deferred to OCSD to justify their continued sealing. (*Id.*)

OCSD also filed a response to the Court's April 23, 2013 Order on May 6,

2013. (Doc. No. 106.) OCSD did not present any compelling reasons to justify keeping the records sealed and refused to resubmit the sealed documents as redacted public filings. (*Id.* at 2.)

On May 23, 2013, the Court found that the parties failed to meet their burden of providing the Court with "articulable facts identifying the interests favoring continued secrecy" and ordered the unsealing of all documents submitted in support of and in opposition to the Motions. ("Order 2" at 3, Doc. No. 107.) The Court required the parties to publicly refile all of the remaining sealed documents, redacting only non-material, confidential information such as social security numbers and non-party names. (*Id.* at 3.)

In compliance with the Court's May 23, 2013 Order, Plaintiff refiled all of his remaining sealed documents in support of an in opposition to the Motions as redacted public filings on May 24, 2013. (Doc. No. 109.) On May 29, 2013, Defendant did the same. (Doc. Nos. 110–114.)

In this order, the Court relies only on the public filings submitted by both parties pursuant to their Motions.

## B. Preliminary Matters

▆▆▆▆ Defendant states that Plaintiff did not meet and confer with Defendant's counsel prior to filing his Motion. (Rossiter Opp'n Decl., ¶ 2.) Plaintiff's failure to meet and confer violates Local Rule 7–3, which requires counsel to contact opposing counsel and meet, preferably in person, to discuss the substance of the contemplated motion ten days prior to its filing. L.R. 7–3. The Court may deny Plaintiff's motion on this basis alone. *See Cucci v. Edwards,* 510 F.Supp.2d 479, 486 (C.D.Cal.2007). The necessity of the meet and confer process is paramount in this case. Cross motions for summary judgment are unnecessary and duplicative since the Court may

enter summary judgment for the nonmoving party based on the undisputed facts. *See* Fed.R.Civ.P. 56(f). If Plaintiff properly met and conferred as required by the local rules, his unnecessary cross motion for summary judgment could have been avoided. Nevertheless, the Court will address the merits of Plaintiff's Motion to the extent it differs from Defendant's Motion.

The Court also notes that the papers filed by the parties do not comply with the Local Rules. The mandatory chambers copies submitted to the Court failed to comply with Local Rules 5–4.5 and 11–5.4 in that the exhibits were not sequentially tabbed.

## II. FACTS

### A. Evidentiary Objections

Plaintiff and Defendant submitted objections to evidence submitted by the opposing party in support of and in opposition to the Motions. (*See* Pl's Opp'n Obj., Pl's Reply Obj., Def's Obj.) The Court addresses objections that are relevant to the resolution of the Motions.

#### 1. Plaintiff's Objections

##### a. Personnel Investigations

Plaintiff objects to Defendant's reliance on multiple OCSD personnel investigations of Montoya dated April 2000, 2001, 2002, March 2006, May 2009, August 2009, and December 2009, and a Notice of Pending Dismissal summarizing a subset of the investigations. (Pl's Opp'n Obj. ¶¶ 5, 7–8, 11, 27, 44–46, 48; Pl's Reply Obj. at 1–2.) Plaintiff makes several evidentiary arguments in an effort to exclude the investigations.

###### i. Hearsay

▆▆▆▆ First, Plaintiff argues that these investigations are inadmissible hearsay

and do not meet the exception for public records under Federal Rule of Evidence 803(8). Defendant argues that the investigations are not offered to prove the truth of the matter asserted and therefore are not hearsay for the purposes of disputing Plaintiff's claims. Fed.R.Evid. 801(c). Plaintiff does not identify the objected—to portions of the investigations, and instead objects to the introduction of the investigations in their entirety. The Court notes that "objections based on hearsay are particularly context-specific, and the Court is not inclined to comb through these documents, identify potential hearsay, and determine if any exception applies—all without guidance from the parties." *De Contreras v. City of Rialto*, 894 F.Supp.2d 1238, 1245 (C.D.Cal.2012) (internal citation and quotation omitted). Nevertheless, the Court examines the nature and form of the investigations to determine if they could be considered hearsay. The Court does not examine any specific statements within the documents.

Plaintiff makes three claims in the FAC, that (a) he was subject to a hostile work environment on account of his military service, (b) OCSD denied him promotions and desired assignments based on his military service, and (c) OCSD initiated personnel investigations and eventually terminated him due to its pervasive animus against Montoya's military service and military accolades. Each of these claims requires Plaintiff to prove that OCSD's conduct was motivated by Montoya's military service. OCSD offers the investigations to demonstrate that its actions were not motivated by anti-military animus, but by the personnel investigations. Statements do not qualify as hearsay when they "are not offered for the truth of the matter asserted, but [a]re admitted to establish that the statement was made or to demonstrate the effect the statement had on the hearer." *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir.1988). As such, the personnel investigations are not hearsay because they are not offered to prove the truth of the matter asserted, but rather are offered to demonstrate the effect the investigations had on OCSD and as evidence of OCSD's motive. *See Hernandez v. City of Vancouver*, 277 Fed.Appx. 666, 672 n. 2 (9th Cir. 2008) (citing *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir.2001)). As Defendant correctly notes, whether Montoya actually committed the acts alleged in the investigations or whether the witnesses' statements were true is irrelevant to the issues in this case, and the investigations are not considered for those purposes. Instead, the investigations go to whether OCSD denied Montoya benefits of employment or initiated personnel actions for reasons other than Montoya's military service. *See Means v. City & Cnty. of San Francisco, Dep't of Pub. Health*, 749 F.Supp.2d 998, 1006 (N.D.Cal.2010) (allowing evidence of statements made in an employer's investigation into employee's inappropriate conduct to show that the employer had a non-discriminatory motive for taking disciplinary action); *Turner v. Univ. of WA*, C05–1575RSL, 2007 WL 2984685, at *2 (W.D.Wash. Oct. 10, 2007) (denying plaintiff's motion to exclude employment investigation files and witness statements to the extent they were being offered to demonstrate that defendants had a non-discriminatory basis for their actions). Moreover, Plaintiff cannot on the one hand request that the Court exclude the investigations as inadmissible hearsay and on the other use the investigations to prove that OCSD discriminated against him due to his military service. (*Compare* FAC ¶ 17 *with* Pl's Opp'n at 15–17.) For the purposes of these Motions, the Court OVERRULES Plaintiff's hearsay objections to the per-

sonnel investigations to the extent the investigations are used to demonstrate OCSD's motive. The Court does not rely on the investigations or the witness statements therein to prove the truth of the matter asserted.

### ii. Relevance and Prejudice

 Plaintiff also argues that the investigations are irrelevant to Plaintiff's claims under Federal Rule of Evidence 401 and cause unfair prejudice, confuse the issues, and mislead the jury under Rule 403. These objections are inapplicable at the summary judgment stage. Summary judgment can be granted "only when there is no genuine dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant." *Burch v. Regents of Univ. of Cal.*, 433 F.Supp.2d 1110, 1119 (E.D.Cal.2006). While the Court may consider Plaintiff's views on whether Defendant's evidence is relevant, it need not exclude evidence at the summary judgment stage for danger of unfair prejudice, confusion of the issues, or any other grounds outlined in Rule 403. *See Bafford v. Travelers Cas. Ins. Co. of Am.*, CIV. S–11–2474 LKK, 2012 WL 5465851, at *8 (E.D.Cal. Nov. 8, 2012). These objections are more properly raised before trial, *R.B. Matthews, Inc. v. Transamerica Transport Servs., Inc.*, 945 F.2d 269, 272 (9th Cir.1991), and Plaintiff may re-raise these objections at that time.

Although the Court declines to exclude the investigations in their entirety, the Court recognizes that portions of the investigations are irrelevant and unduly prejudicial to Plaintiff. Those portions of the investigations which do not pertain to Montoya's job performance, on-duty conduct, or violations of OCSD rules or regulations are irrelevant to Plaintiff's claims and outside the scope of this case. Fed. R.Evid. 401. Specifically, the Court does

not rely on any evidence in the investigations pertaining to Montoya's off-duty romantic relationships or sexual practices. (*See, e.g.,* "Personnel Inv. 09–176," Def's Exhs., Exh. 36 at 355–57.) Evidence of Montoya's personal relationships, nonpublic communications, and off-duty whereabouts which raise no legal or ethical concerns has no tendency to make it more or less probable that OCSD's personnel actions toward Montoya were legitimate and non-discriminatory. *Id.* (*See, e.g.,* Personnel Inv. 09–176 at 373–78.) The Court does not consider those portions of the investigations.

 Even if this evidence were relevant to a fact of consequence, any potential probative value is substantially outweighed by its prejudicial effect. Fed.R.Evid. 403. Details of Montoya's romantic relationships, sexual preferences, and intimate conversations confuse the issues and have an undue tendency to suggest a decision on an improper basis, namely Montoya's legal conduct outside of his employment. *See* Fed.R.Evid. 403 adv. comm. note (" 'Unfair prejudice' ... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

 Beyond the impertinent portions described above, Montoya seeks to exclude all OCSD investigations prior to 2009 as irrelevant and unduly prejudicial. (Pl's Evid. Obj. ¶¶ 5, 7, 8, 11, 27; Pl's Opp'n at 24.) Insofar as these investigations concern Montoya's on-duty conduct or violations of OCSD's rules and regulations, the Court finds that they are highly probative and relevant to OCSD's reasons for denying Montoya promotions and assignments and clearly relevant to why OCSD initiated the investigations and the related "Threat Assessment"—both issues raised in Plaintiff's complaint.

### iii. Character Evidence

Finally, Montoya objects to the pre–2009 investigations as improper character evidence under Federal Rule of Evidence 404 which states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed.R.Evid. 404(b)(1) (emphasis added). Montoya argues that OCSD introduces the old personnel investigations solely to show that Montoya was a bad person who "more likely than not misbehaved in 2009," thereby justifying his later termination. (Pl Opp'n at 24.)

 · Montoya's reliance on Rule 404(b) fails for two reasons. First, evidence of other wrongs or acts may be admissible for other purposes such as to show intent or motive. Fed. Rule Evid. 404(b)(2). As discussed above, OCSD relies on the investigations, including those prior to 2009, to show that OCSD's actions, including the initiation of the investigations themselves, were not motivated by military animus. Second, even if this evidence were inadmissible under Rule 404(b), the "introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir.1988). In this case, Montoya relies on a presentation an OCSD investigator made to command staff in December 2009. ("OCSD Presentation," Pl's Exhs., Exh. X.) The presentation includes fifteen slides: slides one through three are introductory and background information on Montoya, slides four through twelve summarize all of Montoya's personnel investigations, and the next two slides are labeled "Deputy Montoya Threat Assessment." (*Id.*) Montoya argues that his Threat Assessment was "based solely on his military service and laudable accomplishments" and led OCSD to "treat[ ] him like a dangerous psychopath during the rest of his tenure at OCSD." (Pl's Mot. at 20.) Montoya thus placed the basis for the Threat Assessment at issue. OCSD must be allowed to offer slides four through eight, which describe the essential findings of the pre–2009 investigations, to rebut Montoya's argument that the Threat Assessment was based on Montoya's military service.

For these reasons, the Court OVERRULES Plaintiff's objections to the pre–2009 investigations on the basis that they are improper character evidence. However, Plaintiff may re-raise these objections at trial.

### b. Plaintiff's Remaining Objections

 Plaintiff's remaining objections are improper. Plaintiff makes two additional objections on the basis of relevance. (Pl's Opp'n Obj. ¶¶ 6, 52.) For the reasons discussed above, these objections are inapplicable at the summary judgment stage and the Court does not rule on them here. *See Burch*, 433 F.Supp.2d at 1119. The remainder of Plaintiff's objections are improperly directed at portions of OCSD's opposition brief, not at the evidence cited therein. (Pl's Reply Obj. at 1–2.) *Cf. Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F.Supp.2d 1122, 1126 n. 1 (E.D.Cal.2008) ("Plaintiff's 'evidentiary objections' to Defendants' separate statements of undisputed facts are not considered because such objections should be directed at the evidence supporting those statements."). Moreover, these objections all appear to be aimed at the portions of OCSD's opposition which refer to Montoya's personnel investigations. The Court addressed identical objections to the personnel investigations above, and need not do so again here.

### 2. Defendant's Objections

■ Defendant raises hearsay objections to six exhibits which were offered in support of Plaintiff's Motion. (Def's Obj. at 2–3.) All six exhibits are memoranda from Montoya to one of his superiors reporting specific incidents of "harassment" or "hostile work environment" he experienced as a deputy. (Pl's Exhs., Exhs. P–U.) OCSD argues that these memos should be excluded in their entirety because they are out-of-court statements used to prove that the conducted alleged therein actually occurred. (Def's Obj. at 2–3.)

At the summary judgment stage, the Court does "not focus on the admissibility of the evidence's form," but rather on the admissibility of its contents. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). Thus, if the contents of the memoranda could be presented in an admissible form at trial, the Court may consider them in deciding the summary judgment motions. *Id.* at 1037; *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir.2010) ("[T]he evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial.").

In *Fraser*, plaintiff relied upon her diary, which detailed the effects of her diabetes on her daily life, in opposing her employer's motion for summary judgment on her disability claim. Defendant argued the diary was hearsay, and could not be considered by the court. The Ninth Circuit disagreed, reasoning that:

> "The contents of the diary are mere recitations of events within Fraser's personal knowledge and, depending on the circumstances, could be admitted into evidence at trial in a variety of ways.

Fraser could testify to all the relevant portions of the diary from her personal knowledge. Fed.R.Evid. 602. If she forgets the exact dates or the details of the events, she may be able to use the diary to refresh her recollection. Fed. R.Evid. 612.... If the diary fails to refresh her recollection, she might still be able to read the diary into evidence as a recorded recollection under Fed. R.Evid. 803(5)."

*Id.* at 1037. Similarly, Montoya's memoranda are recitations of events within Montoya's personal knowledge and could be admitted into evidence at trial via any combination of the methods suggested by the *Fraser* court.[3] As such, the Court may consider the memoranda at the summary judgment stage, and therefore OVERRULES Defendant's hearsay objections to Montoya's memoranda.

## B. Disputed and Undisputed Facts

These facts pertain to the issues presented in both Plaintiff's and Defendant's Motions. Unless specifically noted, the following material facts are supported adequately by admissible evidence and are uncontroverted; they are "admitted to exist without controversy" for purposes of the Motion. L.R. 56–3. All disputed facts are explicitly designated as such.

### 1. Plaintiff's Background and Military Service

In 1989, Plaintiff Scott Montoya joined OCSD as a Sheriff's Special Officer. (Pl's SUF ¶ 1; Def's SGI ¶ 1.) Montoya enlisted in the Marine Corps in 1995, and took a leave of absence from OCSD to attend boot camp. (Def's SUF ¶ 2; Pl's SGI ¶ 2.) After boot camp, Montoya served in the

---

**3.** To the extent Plaintiff relies on these memoranda to demonstrate that OCSD was aware of the incidents Montoya describes therein, the memoranda are not being offered for their truth and therefore are not hearsay.

Marine Corps Reserve while he worked at OCSD. (Def's SUF ¶ 3; Pl's SGI ¶ 3.)

In 1997, Montoya was promoted to Deputy Sheriff I (Def's SUF ¶ 4; Pl's SGI ¶ 4), and was initially placed in the Central Jail. (Deposition of Scott Montoya ("Montoya Depo.") 84:1–4, Def's Exhs., Exh. 33, Pl's Exhs., Exh. B.) In July 2001,[4] Montoya was promoted to Deputy Sheriff II. (Def's Exhs., Exh. 11.)

In 2002, the Marines called Montoya to active duty. (Def's SUF ¶ 9; Pl's SGI ¶ 9.) Montoya served as a Scout Sniper in Iraq from 2002 to 2003. (Def's SUF ¶ 10; Pl's SGI ¶ 10.) Due to his mastery of the Marine Corps Martial Arts Program,[5] Montoya also served as the battalion's martial arts instructor. (Pl's Exhs., Exh. EE at 3442.) Montoya received high marks and manifest praise from his commanding officers while he was on active duty. (*Id.* at 3437–3448.)

Upon his return from Iraq, Montoya resumed his position with OCSD while remaining in the Reserves. (Def's SUF ¶ 10; Pl's SGI ¶ 10.) Montoya's obligation to the Marine Corps Reserves ended in September 2004. (Def's SUF ¶ 13; Pl's SGI ¶ 13.) At the time of his discharge, Montoya achieved the rank of Sergeant. (Montoya Depo. 102:6–7.)

In October 2004, pursuant to Montoya's request, OCSD transferred Montoya to the station in Stanton, California to begin patrol training. (Def's SUF ¶¶ 12, 14; Pl's SGI ¶¶ 12, 14.) On February 6, 2005, Montoya passed patrol training. (Def's SUF ¶ 21; Pl's SGI ¶ 21.)

For his "leadership," "courage," and "devotion to duty" as a Scout Sniper during the Battle of Baghdad on April 8, 2003, Montoya was awarded the Navy Cross by the Secretary of the Navy. (Pl's Exhs., Exh. C.) A formal ceremony commemorating Montoya's receipt of the medal was held in January 2005, and was attended by many public figures and OCSD representatives. (Def's SUF ¶ 20; Pl's SGI ¶ 20.)

In May 2009, Montoya was transferred from Stanton to South Operations. (Def's SUF ¶ 42; Pl's SGI ¶ 42.) On October 8, 2010, OCSD terminated Montoya's employment. (Def's SUF ¶ 49; Pl's SGI ¶ 49.)

## 2. Applications for Advancement

Montoya applied to be a Deputy Sheriff four times between 1989 and 1994, but he was denied each time. (Def's Exhs., Exh. 1 at 8.) The reasons for his denial included "lack of maturity," "poor driving record," "deceptions with another police agency," and failing the psychological evaluation. (*Id.*) In 1997, Montoya was finally promoted to Deputy Sheriff I. (Def's Exhs., Exh. 2.) In 2001, Montoya was again promoted, this time to Deputy Sheriff II. (Def's Exhs., Exh. 11.)

Montoya also twice applied for the SWAT team in 2000 and 2005. (Deposition of Michael Peters ("Peters Depo.") 31:11–14, Def's Exhs., Exh. 5.) For his 2000 application, Montoya passed the physical test and oral board interview, but he did not get through the evaluation of his personnel jacket or the peer evaluation process. (Def's SUF ¶ 6; Pl's SGI ¶ 6; Peters Depo. 62:10–13.) On November 5,

---

4. The date of Montoya's promotion to Deputy Sheriff II is unclear. Montoya states he was promoted in late 2003 or early 2004 (Montoya Depo. 84:15–16), but in the patrol transfer request Montoya filed on June 8, 2004, he lists his promotion date at July 27, 2001

(Defs. Exhs., Exh. 11). For purposes of this order, the Court assumes he was promoted in July 2001.

5. Montoya earned a first-degree black belt in the MCMAP. (Pl's Exhs., Exh. EE at 3442.)

2005, Montoya again applied for SWAT, but was unable to pass the physical fitness test, receiving 3 points below the required 80 percent, and therefore did not move on in the application process. (Peters Depo. 66:7–19.) Military service is a consideration in the SWAT application process and gives an applicant a "leg up." (Peters Depo. 59:2–12.)

When Montoya passed patrol training in February 2005, he was promoted to Deputy Sheriff II. (Montoya Depo. 90:1–4.) From 2006 through the end of 2008, Montoya met expectations on each of three performance evaluations and was ranked competent in most categories. (Pl's Exhs., Exhs. M–O.)

In mid–2008,[6] Montoya applied to the transit police. (Montoya Depo. 290:2–4.) He submitted a memorandum of interest, but he was not granted an interview which Montoya states is "very uncommon." (Montoya Depo. 290:5–25.)

In late 2008, Montoya was assigned to be Stanton's first Gang Reduction and Intervention Program ("GRIP") officer. (Deposition of Librado Trujillo ("Trujillo Depo.") 96:3–7, Def's Exhs., Exh. 28, Pl's Exhs., Exh. L, Pl's Opp'n Exhs., Exh. 6.) The GRIP was a collaborative effort with other police departments and the District Attorney's office designed to address the issue of truancy in elementary schools. (Trujillo Depo. 91:15–24.) Stanton's Chief of Police at the time, Librado Trujillo, chose Montoya for this "important" position because of a recommendation from fellow Deputy Dave Rios, his work with the city to develop a Veterans Memorial Park, and his status as a "war hero." (Trujillo Depo. 91:10–11; 96:8–25.) Because the GRIP funding was limited, Montoya's GRIP duties were collateral to his

primary duty as a patrol deputy. (Trujillo Depo. 97:9–98:13.)

The following year, in January 2009, Montoya applied to be a Terrorist Liaison Officer ("TLO"). (Def's SUF ¶ 36; Pl's SGI ¶ 36.) After submitting a memorandum of interest and participating in an interview, Montoya was not selected for the position because his memo "was a mess" and he did not have any prior knowledge of an identified terrorist organization. (Id.) Out of the ten interviewed applicants, the selected individual was a deputy and a former Marine who submitted a "neat," "concise" memo and spoke well at the interview. (Deposition of Timothy Rainwater ("Rainwater Depo.") 26:23–27:7, Def's Exhs., Exh. 32.; Montoya Depo. 295:1–10.)

Around the same time, Montoya also applied to be a Tactical Training Officer ("TTO"), but he was not granted an interview. (Montoya Depo. 297:11–298:8.) Montoya believes that the academy commander in charge of interviewing for the TTO position had military animus toward him because he was overqualified for the position such that he should have at least received an interview. (Montoya Depo. 298:12–21.)

In February 2009, Sergeant Dexter and Lieutenant Passalaqua decided to rotate Montoya out of his responsibilities as a GRIP officer. (Deposition of Steve Dexter ("Dexter Depo.") 158:19–23, Pl's Exhs., Exh. V, Pl's Opp'n Exhs., Exh. 28.)

Finally, in April 2009, Montoya applied to become a Sergeant, but he was not selected for the position. (Def's SUF ¶ 39; Pl's SGI ¶ 39.) Of the 24 OCSD employees promoted to Sergeant at the time of Montoya's application, eight served in the

---

**6.** The date of his transit police application is unclear. Montoya testified that he applied only once in mid–2008 (Montoya Depo. 290:2–4), but the memoranda he submitted to apply for the position is dated May 5, 2009. (Def's Exhs., Exh. 35.)

military, five specifically in the Marine Corps. (Def's SUF ¶ 40; Pl's SGI ¶ 40.)

Montoya believes that animus toward his military service prompted his failure to obtain interviews and promotions throughout his careers with the OCSD. (Montoya Depo. 299:2–20.) OCSD disputes this allegation and notes that numerous OCSD employees at all ranks, including those stationed at Stanton, have served in the military,[7] and many have combat experience. (Deposition of Timothy Cullen ("Cullen Depo.") 121:3–17, Pl's Exhs., Exh. J, Pl's Opp'n Exhs., Exh. 5) (identifying four OCSD employees who worked at Stanton who have military combat experience).

### 3. Personnel Investigations

During the course of Montoya's employment, OCSD initiated seven personnel investigations of Montoya's conduct.

The first investigation, in April 2000, commenced after a female nurse at the Intake Release Center reported that Montoya allegedly engaged in inappropriate physical contact. ("2000 Investigation," Def's Exhs., Exh. 4.) The investigation was not sustained due to a lack of evidence. (Def's Exhs., Exh. 3.)

In 2001, cooks working at the Central Jail complained that Montoya purportedly asked female inmates personal questions and pressured them to pass notes to other inmates while they were working on the serving line. ("2001 Investigation" at 1, Def's Exhs., Exh. 6.) Montoya denied all of the allegations and stated he did not know any of the inmates who participated in the investigation. (2001 Investigation at 4.) The final disposition of this investigation is unknown. (Def's Exhs., Exh. 7.)

OCSD sustained allegations of sexual misconduct by Montoya in 2002 and issued a forty-hour suspension without pay. ("2002 Investigation," Def's Exhs., Exh. 8.) Shortly thereafter, Montoya left for Iraq, and when he returned he appealed OCSD's decision to suspend him and the disposition was reduced to a written reprimand. (Def's Exhs., Exh. 9.)

In 2006, OCSD investigated Montoya's alleged personal association with a wanted felony suspect. ("2006 Investigation," Def's Exhs., Exh. 21–23.) The investigation was sustained and Montoya received a 240–hour suspension. (Def's Exhs., Exh. 23.)

Finally, in 2009, OCSD initiated three separate investigations into Montoya's conduct. Investigation 09–176 began on May 20, 2009 when supervisors reported that Montoya was using his GRIP position as a means to avoid his patrol duties and visa versa. ("09–176 Investigation," Def's Exhs., Exh. 36.) The investigation revealed that Montoya was frequently untruthful about his whereabouts and had engaged in "excessive log falsification." ("Not. of Dismissal" at 4–5, Def's Exhs., Exh. 39.) In addition, the investigator found that Montoya frequently made advances toward women while on duty. (*Id.*) This investigation was cited as a basis for Montoya's dismissal. (*Id.*)

In the summer of 2009, OCSD initiated investigation number 09–244 into an inappropriate, explicit comment Montoya allegedly made while questioning juveniles who were stopped for loitering. ("09–244 Investigation," Def's Exhs., Exh. 37.) Montoya denied making the comment. (09–244 Investigation at 2.) The investigation was

---

7. For example, Deputy Cullen was a medic in the Army (Cullen Depo. 122:9–10), Lieutenant Rainwater served in the Air Force (Rainwater Depo. 12:9–12), and Investigator Taft was a colonel in the Marine Corps (Deposition of Davis W. Nighswonger ("Nighswonger Depo.") 116:7–8, Pl's Opp'n Exhs., Exh. 12, Def's Opp'n Exhs., Exh. 3).

sustained and was a predicate for Montoya's dismissal. (Deposition of Roland Chacon ("Chacon Depo.") 215:14–16, Pl's Exhs., Exh. Y, Pl's Opp'n Exhs., Exh. 11; Not. of Dismissal at 10–13.)

OCSD conducted its final investigation of Montoya, number 09–399, for inappropriately and inadequately handling a domestic violence incident. ("09–399 Investigation," Def's Exhs., Exh. 38.) Montoya was not interviewed as a part of this investigation. (*Id.*) Just as with the two other 2009 investigations, number 09–399 was sustained and cited as a basis for Montoya's dismissal. (Not. of Dismissal at 13–19; Chacon Depo. 108:9–109:2.)

### 4. Training

Plaintiff began his patrol training in Stanton in October 2004. (Def's SUF ¶ 14; Pl's SGI ¶ 14.) Deputy Tim Keller was assigned to be Montoya's Field Training Officer ("FTO"). (Def's SUF ¶ 16; Pl's SGI ¶ 16.)

After approximately six weeks of training, Keller wrote a memo to Sergeant Moreno requesting that he no longer serve as Montoya's FTO. ("Keller Memo.," Def's Exhs., Exh. 15.) Keller states that Montoya "should not be allowed to pass training," and he "was going to fail" him. (Keller Memo. at 1–2.) Keller bases his conclusion on Montoya's "emotional state," specifically his temper and the fact that he was quick to cry as a result of criticism. (*Id.*) In addition, Keller cites Montoya's inability to perform basic patrol tasks such as log completion, car stops, and radio calls. (*Id.*) Keller states that "because Dep. Montoya just got back from Iraq and did not have time to prepare for patrol and the stress he went through during the war he may need to seek counseling." (*Id.* at 2.) In his deposition, Keller states that once he was no longer Montoya's FTO, he "wanted to get as far away from

him as possible." (Deposition of Timothy John Keller ("Keller Depo.") 56:9–12, Def's Exhs., Exh. 14, Pl's Exhs., Exh. F, Def's Opp'n Exhs., Exh. 2.) He recounts several encounters during training where Montoya threatened violence, including holding a pen inches from Keller's eye. (Keller Depo. 30:6–33:2.) Keller also expressed his dissatisfaction with Montoya's training to other OCSD employees, noting that many other deputies are military "heros [ ] that have fought in wars." (Keller Depo. 63:4–19.)

Deputy Rios replaced Keller as Montoya's FTO on or about November 12, 2004. (Keller Depo. 48:3–8.) Captain Eason, Stanton's Chief of Police at the time, selected Rios to be Montoya's FTO because the two shared a military background and Rios could convince Montoya to "see somebody" if he needed to. (Deposition of Robert Eason ("Eason Depo.") 49:22–51:16, Def's Exhs., Exh. 13, Pl's Exhs., Exh. D, Pl's Opp'n Exhs., Exh. 7.)

On February 5, 2005, Dr. Ray William London completed a preliminary psychological evaluation of Montoya at the request of the Orange County Deputy Sheriff's Association ("Union") and found that Montoya showed "no objective or professional indications of a PTSD diagnosis." (Pl's Opp'n Exhs., Exh. 2 at 6.)

On February 6, 2005, Captain Eason made the decision that Montoya satisfactorily completed patrol training. (Def's Exhs., Exh. 16; Eason Depo. 72:25–73:6.) Several OCSD officers felt that Montoya was allowed to pass patrol training because of his "military record" and/or preferential treatment Montoya received from Sheriff Mike Corona. (Keller Depo. 58:17–59:18; Cullen Depo. 74:7–13; Deposition of Tim Board ("Board Depo.") 104:2–105:6, Pl's Exhs., Exh. K, Pl's Opp'n Exhs. 8.)

### 5. Incidents at Stanton

While Montoya was stationed in Stanton from 2004 to 2009, there were several incidents between him and his OCSD coworkers. Many of the incidents involved Deputies Tim Cullen and/or Tim Keller, who were also stationed in Stanton. Montoya wrote reports addressed to his superiors describing several of these incidents.

In general, Montoya states that Keller frequently made comparisons between his military service and his police work with statements such as you "got by over there, but here in police work, this is the way we do it." (Montoya Depo. 325:6–19, 28:11–14.) Deputy Sprague testifies that practically any time he saw Keller and Cullen "they were talking about how Scott Montoya had been in the military and . . . the Navy Cross" and that "he's a liar and he didn't deserve it." (Deposition of John Sprague ("Sprague Depo.") 27:1–8, Pl's Exhs., Exh. G, Pl's Opp'n Exhs., Exh. 3.) OCSD disputes Montoya's and Sprague's contentions; instead, it cites evidence to show that any incidents which occurred were not done to demean Plaintiff's service. (Def's SGI ¶ 10) (citing Cullen Depo. 123:11–124:10; Keller Depo. 88:6–21).

Both Sprague and Montoya testify that incidents such as those described below happened "numerous times every day" "whenever [Montoya] was working." (Sprague Depo. 50:1–9; see Montoya Depo. 30:7–9.) OCSD disputes this fact on the basis that it is hyperbolic thereby putting the affiants' credibility at issue and that several witnesses never saw any of the incidents. (Def's SGI ¶ 9.)

Keller admits he had several encounters with Montoya because Montoya was not in his area and everyone else was handling his calls "while he was either flirting with a girl or off doing Scotty things." (Keller Depo. 87:16–21.) Keller states he has no respect for Montoya. (Keller Depo. 86:19–25.)

Captain Eason recognizes that some OCSD deputies "disliked Scott" in part because Montoya would be relieved of duty for his military obligations and the "continuous national recognition" he received for his service. (Eason Depo. 84:7–85:17.) Sergeant Dexter specifically identifies that Keller and Cullen did not get along with Montoya. (Dexter Depo. 172:7–20; see also Deposition of Dave Rios ("Rios Depo.") 98:19–20, Def's Opp'n Exhs., Exh. 8.)

Finally, several OCSD employees heard rumors that Montoya had not actually earned the Navy Cross.[8] (Keller Depo. 63:24–64:19; Board Depo. 106:14–24; Deposition of Davis W. Nighswonger ("Nighswonger Depo.") 110:5–111:24, Pl's Opp'n Exhs., Exh. 12, Def's Opp'n Exhs., Exh. 3.) [9]

---

8. OCSD disputes this fact, contending it is vague as to time and scope. (Def's SGI ¶ 6.) However, given the large number of witnesses who heard the rumor and the length of time Montoya was employed by OCSD, the Court finds that it is not necessary to define a specific time period within which the rumor circulated. The fact that a rumor regarding Montoya's Navy Cross circulated at some point during Montoya's employment with OCSD is sufficiently supported and uncontroverted. In addition, the fact that some employees were not aware of the rumor does not controvert this fact. (See Deposition of Dave Rios ("Rios Depo.") 23:8–12, Def's Opp'n Exhs., Exh. 8.)

9. Keller recalls that a fellow Deputy, who was also a Marine Scout Sniper, stated that Montoya "was never a scout sniper" and he had heard from platoon members in Deputy Montoya's charge that Deputy Montoya went to each one of them and said, " 'Did you see what I did?' sign this, in that regard, and that basically they gave him the medal to make the Marine[ ] reserves look good. . . . So when, in fact, he was saying that he didn't believe he

#### a. Dispatch Call with Keller

On February 6, 2005, Montoya arrived as backup to a dispatch call, and Keller was already at the scene. ("Dispatch Call Memo," Pl's Exhs., Exh. P.) Montoya contends that Keller started to hit his hands together while staring at Montoya. (*Id.*) Keller disputes this fact. (Keller Depo. 85:19–21.)

Next, Keller approached Montoya and, using profanity, stated that he did not want Montoya coming to his dispatch calls. (Dispatch Call Memo; Keller Depo. 85:10–17.)

Montoya spoke with Sergeant Honea about this matter, and he promised to contact Keller. (Dispatch Call Memo.) Sergeant Honea did contact Keller regarding the incident. (Keller Depo. 86:19–25.)

A day after the incident Montoya drafted a memo directed to Captain Eason summarizing the events entitled "Harassment by Deputy Keller." (Dispatch Call Memo.)

#### b. Cullen Complaint

On November 1, 2005, Montoya sent a memo to Captain Eason and Sergeant Amon describing incidents in which Cullen allegedly made false statements about Montoya to citizens. ("Cullen Complaint," Def's Exhs., Exh. 18.) Those statements purportedly included Cullen telling a citizen to file a complaint against Montoya for flirting and that Montoya was incarcerated for rape. (*Id.*)

Pursuant to this memorandum, OCSD officials ordered a personnel investigation into Cullen's conduct. ("Cullen Investigation," Def's Exhs., Exh. 20.) Cullen received a written reprimand for violating

the spirit of the department. (Cullen Depo. 81:11–14.)

#### c. Locked Plaque

In July 2006, deputies took a plaque Montoya received, placed it inside a clear locked case where the schedules are posted, and drew a star around it and the words "golden boy."[10] (Montoya Depo. 313:25–314:6.) Montoya believes either Keller or Cullen and Keller together were responsible. (*Id.*) Keller disputes having any involvement. (Keller Depo. 92:13–23.)

Montoya also drafted a memo addressed to "Myself" describing the incident. ("Plaque Memo," Pl's Exhs., Exh. T.)

#### d. Navy Cross Hats for Sale

On August 24, 2006, Montoya arrived for his briefing and on the white board was written "Navy Cross Recipient Hats for Sale; You must pay for them up front," and stated that the price was $10.00. ("Hats Memo," Pl's Exhs., Exh. R.) Montoya believes this is directed at him because he is the only recipient of the Navy Cross in the Stanton station. (*Id.*)

The origin of the writing on the board is disputed. Montoya states he saw Cullen or Keller writing on the whiteboard around the time of the incident. (Montoya Depo. 330:20–331:2.) Sprague also saw the writing on the board and witnessed Cullen laughing and bragging about it. (Cullen Depo. 36:1–37:11.) However, Keller states that never saw or heard about the writing on the whiteboard, "nor did [he] ever make fun of his Navy Cross in any disrespectful way." (Keller Depo. 88:6–15; 92:1–7.) Cullen similarly testifies that he had no personal knowledge of the incident, but he believed it occurred, not-

---

deserved that medal." (Keller Depo. 64:3–19.)

**10.** There is a dispute as to whether the words "golden boy" were present. Montoya states

the phrase was written around the plaque (Montoya Depo. 313:25–314:6), however, his memo does not mention it ("Plaque Memo," Pl's Exhs., Exh. T).

ing "it comes with the territory." (Cullen Depo. 122:2–25.)

On the day of the incident, Montoya drafted a report addressed to Captain Eason wherein he describes this as "a direct attack on his military service as with incidents in the past" and "request[s] you look into this matter." (Hats Memo.) Montoya also states that he notified Sergeant Amon of the incident. (*Id.*)

### e. "Handle Your Area"

Montoya made a written record of an incident on November 6, 2006 where Keller approached him in the report writing room and, using obscene language, told Montoya several times to "handle [his] area," implying that he was not patrolling his assigned territory. ("Area Memo," Pl's Exhs., Exh. Q.) Montoya addressed his memo to Captain Eason. (*Id.*)

### f. 1–800–NVY–CROS Business Card

In a memoranda labeled "continued hostal [sic] work environment" addressed to Captain Eason on March 6, 2007, Montoya describes an incident which occurred when he entered the station's report writing room and saw a business card lying on the desk. ("Business Card Memo," Pl's Exhs., Exh. S.) The card said "Private Instructor" and the name "S. Montoya" was handwritten on it. (*Id.* at 2.) At the bottom of the card, the phone number was crossed out and was rewritten as "1–800–NVY–CROS." (*Id.*)

Again, the source of the business card is disputed. Montoya says he saw Cullen place the business card in the report writing room. (Montoya Depo. 318:12–319:3; Business Card Memo.) Sprague testifies that he saw the card and afterward saw Cullen excitedly encouraging others to go look at it. (Sprague Depo. 37:16–40:7.) On the other hand, Keller states that he never saw the card, and describes it as a "stroke" or "teasing." (Keller Depo.

89:20–90:13.) Cullen also has no knowledge of the incident, but believes that it occurred. (Cullen Depo. 123:3–15.)

In the memo, Montoya states he advised Sergeant Amon, who forwarded the issue to Captain Eason, and then onto personnel, but they denied that it was harassment. (Business Card Memo; *see* Montoya Depo. 319:6–320:8.) Montoya does not believe anyone was disciplined as a result of this incident. (Montoya Depo. 320:4–10; Business Card Memo.)

### g. Sex Toy

As explained by Montoya, he and Cullen were in the gear locker at the station preparing for patrol in September 2007. (Montoya Depo. 328:5–22.) When Montoya opened his bag, he found a phallic sex toy inside. (*Id.*) There was also a box with lubricant in a clear bottle. ("Sex Toy Memo," Pl's Exhs., Exh. U.) Cullen laughed and joked about it and told Montoya to "wear gloves" and "not to get lubrication" on his gear. (Montoya Depo. 328:5–22.)

In November 2007, Montoya wrote a report regarding the incident to Assistant Sheriff Trujillo and states that he took the sex toy and the lubrication to Trujillo's office. (Montoya Depo. 329:2–11.) Trujillo states that although Montoya discussed the incident with him, he disputes that he received any memo documenting it or the items mentioned therein. (Trujillo Depo. 23:17–25:6.) After hearing about the incident from Montoya, Trujillo believed it was a case of found property, but he did not investigate further. (Trujillo Depo. 28:11–17, 31:5–10.)

Montoya does not believe Cullen was disciplined for his actions. (Montoya Depo. 329:15–330:16.)

### h. MDC Chat

After completing a call on October 28, 2007, Montoya returned to his patrol car

and noticed a chat on the Mobile Data Computer ("MDC")—a communications system available in all OCSD patrol cars. ("MDC Memo," Def's Exhs., Exh. 29.) In reference to Montoya's failure to use the correct radio code, Keller typed into the chat "How did this guy pass training ... only the best in Stanton ... This guy is danderous [sic] ... He is the worst I have ever seen ... I failed him on training but he is the Sheriff's boy." ("Keller Investigation" at 1669–70, Pl's Exhs., Exh. I.)

Pursuant to Montoya's complaint and follow up memo, OCSD initiated a personnel investigation into Keller's conduct on the MDC. (Keller Investigation at 1656.) The investigation was sustained and Keller received a written and verbal reprimand. (Keller Investigation at 1646; Keller Depo. 99:23–100:7.)

### i. Taped Locker

Montoya and Sprague describe another incident wherein a fellow deputy took tape and wrapped it around Montoya's locker so he was unable to enter the combination and then slid the locker into the restroom, thereby making him late for briefing. (Montoya Depo. 313:14–23; Sprague Depo. 34:7–13.) Montoya believes Deputy Cullen was responsible for the taping. (Montoya Depo. 313:14–23.)

Montoya addressed the incident verbally with Sergeant Amon. (Montoya Depo. 332:7–24.)

### j. "Real Heroes" Article

Keller posted an article on a bulletin board in the Stanton Station describing two Marines who died preventing a truck wired with explosives from entering an American military compound. (Sprague Depo. 29:18–30:9; Keller Depo. 96:5–25.) On the copy of the article, Keller wrote "these two are real heros." (Montoya Depo. 320:12–17; Sprague Depo. 29:25–30:9; Keller Depo. 96:5–25.)

Sprague believes the comment was written as a derogatory slur toward Montoya's service, implying the pictured service members were heroes, but Montoya was not. (Sprague Depo. 30:1–9, 32:5–15.) Keller disputed this notion stating he posted the article because he was proud of the Marines, and that it had nothing to do with Montoya. (Keller Depo. 96:5–25.)

Montoya complained about the article to his supervisor, Lieutenant Passalaqua, handed him the article, and was told Passalaqua "would handle it." (Montoya Depo. 320:24–321:19.) Montoya does not believe Keller was disciplined because the "unprofessional" behavior continued. (Id. 321:20–322:18.)

### k. Bullet Sponge

According to Montoya, Cullen made a comment that he was a "bullet sponge," which Montoya interpreted as an insult to the Marine Corps implying that Marines absorb bullets and are disposable. (Montoya Depo. 325:20–328:1.) Although Cullen served in the Army, Montoya explained that he found such a comment from a non-Marine to be offensive. (Id.)

## 6. Removal of GRIP Duties & Transfer to South Operations

In late February 2009, Sergeant Dexter and Lieutenant Passalaqua removed Montoya's GRIP responsibilities and transferred them to another deputy. (Dexter Depo. 128:19–23.)

The parties dispute why OCSD removed Montoya's GRIP duties. OCSD asserts Montoya misrepresented the amount of time he was dedicating to GRIP activities. (Dexter Depo. 160:14–23, 161:3–5; see 09–399 Investigation at 1–2.) Montoya contends that after a change in leadership, Sergeant Dexter now expected Montoya to be available to answer patrol calls while he

was completing GRIP duties. (Pl's SUF ¶ 24.)

In May 2009, Montoya was transferred from Stanton to South Operations. (Def's SUF ¶ 42; Pl's SGI ¶ 42.)

### 7. Internal Affairs Presentation and Threat Assessment

When Internal Affairs ("IA") received a memo from Sergeant Dexter regarding allegations of log falsification, they initiated Personnel Investigation 09–196, as described above. (*See* 09–176 Investigation at 2.) Two other investigations followed, 09–244 and 09–339, initiated on August 25, 2009 and December 1, 2009, respectively. (09–244 Investigation at 1; 09–339 Investigation at 1.) Investigator Lavinia Vega conducted all three investigations. (Vega Decl. ¶ 2.)

On December 7, 2009, Vega presented a 15–slide PowerPoint regarding Montoya's history, personnel file, and "Threat Assessment" to OCSD's executive staff. ("OCSD Presentation," Pl's Exhs., Exh. X.) The executive briefing occurred because Montoya was a "termination case." (Nighswonger Depo. 52:8–11.) The second slide, entitled "Executive Summary," states "Deputy Montoya exhibits a dangerous pattern of misconduct." (OCSD Presentation at 3071.) Slide three includes a photo of Montoya, his vital information, and a history of his departmental assignments. (*Id.* at 3072.) Slides four through twelve are a summary of all seven of OCSD's personnel investigations of Montoya's conduct. (*Id.* at 3073–81.) Each investigation slide includes a summary of the complaint received, usually some information obtained from witnesses interviewed pursuant to the investigation, and the dis-

position and punishment, if any. (*Id.*) As to the three ongoing 2009 investigations, the slides include the information received in the investigation thus far. (*Id.* at 3078–81.)

Slides thirteen and fourteen are entitled "Deputy Montoya Threat Assessment." (*Id.* at 3082–83.) Vega prepared the assessment which was conducted by OCSD's Dignitary Protection Team ("DPI"), a unit charged with assessing any potential threats to personnel in the department. (Chacon Depo. 164:13–21.) Several OCSD witnesses state that the Threat Assessment was created due to concerns raised by witnesses pursuant to the personnel investigations, Montoya's reaction to past incidents with fellow employees, his military training, and concerns about post-traumatic stress which "led to a concern that if ... he was going to be severely disciplined and perhaps terminated, that he could react in an unstable violent way." (Nighswonger Depo. 52:25–53:15, 107:16–21;[11] Chacon Depo. 162:20–25; Board Depo. 117:4–18.)

Slide thirteen includes a photo of Montoya holding a sniper rifle with an image of the Navy Cross in the corner. (*Id.* at 3082.) The accompanying text describes that Montoya is a Scout Sniper with combat experience in Iraq, a winner of the Navy Cross, and defines the mission of a sniper as "reconnaissance, surveillance, and killing enemy leaders and other key personnel with single, well-aimed shots." (*Id.*) The next bullet states Montoya is a 6th Degree Black Belt in Kenpo Karate and a championship winner. (*Id.*) Finally, the slide describes the make, model, and serial number of Montoya's registered assault rifle. (*Id.*)

---

11. Investigator Nighswonger recalls a "degree of rage and anger" by Montoya during the 2002 Investigation and a similar reaction where Montoya was on the "verge of boiling out of control" when he was notified of a schedule change. (Nighswonger Depo. 53:16–54:8.)

Slide fourteen includes five bullet points, four of which are based on statements made by witnesses pursuant to the personnel investigations.[12] The first states Montoya is known to boast of his sniper and karate skills, including in the media. (*Id.* at 3083) (quoting witness statement in 09–176 Investigation at 43). Bullets two and three state that department employees, respected professionals, and individuals who know Montoya "have expressed grave concern for anyone who crosses him" and that he is "unstable often blowing up with anger when he gets upset." (*Id.*) (paraphrasing witness statements in 09–176 Investigation at 39, 45, 73.) Bullet four describes that it is accepted IA banter that investigators should "wear vests" and "be on guard" when investigating Montoya. (*Id.*) Chacon confirmed that the investigators expressed this concern among themselves. (Chacon Depo. 159:10–160:24.) The final bullet point states that due to intimidation, superiors had to force a Deputy District Attorney to cooperate with IA's investigation of Montoya. (*Id.*) (citing witness statement in 09–176 Investigation at 39.)

The final slide labeled "Course of Action" describes OCSD's next steps, including completing open investigations and issuing discipline, engaging in presurveillance of Montoya before his Administrative Leave in order to "[a]ttempt to discover additional misconduct," conducting surveillance with covert video while Montoya is on leave, and canvassing Montoya's past on-duty dispatch history. (*Id.* at 3084.)

### 8. Administrative Leave and Surveillance

The day after OCSD's Presentation, on December 8, 2009, Montoya was placed on administrative leave. (Pl's Exhs., Exh. W; Chacon Depo. 165:1–11.)

Pursuant to the next steps described in OCSD's Presentation, OCSD installed a camera outside Montoya's residence so that the investigators would know when he was leaving his residence. (Pl's Exhs., Exh. W, Chacon Depo. 164:4–165:6.) On December 9, 2009, OCSD also pulled the vehicle registration data for Montoya. (Pl's Exhs., Exh. Z; Chacon Depo. 168:4–169:19.) OCSD utilized a GPS transmitter to track the location of Montoya's car from at least December 12, 2009 to December 25, 2009. (Chacon Depo. 174:23–177:9; Pl's Exhs., Exh. BB.)

On December 10, 2009, OCSD distributed a memorandum to all Division Commanders and Captains including Montoya's photo and a notice that he was on Administrative Leave and was not allowed to enter OCSD facilities.[13] (Sprague Depo. 89:6–13; Pl's Exhs., Exh. AA.) If he was seen at

---

**12.** Plaintiff asserts that OCSD does not know the identity of any of the unnamed individuals who serve as the basis of these bulleted statements. (Pl's Mot.s at 11–12.) Plaintiff cites to Roland Chacon's deposition where he states he did not know who specifically was the source of the statements. (Chacon Depo. 158: 1–24.) However, Chacon later states that these bullet points were based on the "investigations at that time and even prior where witnesses had described he had a temper." (Chacon Depo. 161:2–6.) He specifically states that Plaintiff "should find some things pertaining to ... the last three [bullet points]" "in the witness interview materials."

(Chacon Depo. 161:7–13.) As Chacon suggests, a review of the investigations reveals that many of these bullet points are direct quotes or paraphrases of statements witnesses made pursuant to OCSD's investigations. Moreover, Investigator Nighswonger specifically identifies some of the individuals with their specified concerns. (Nighswonger Depo. 62:3–24.)

**13.** There is a dispute as to whether Montoya could not enter any OCSD buildings or any county buildings. (*Compare* Sprague Depo. 89:6–12 *with* Pl's Exhs., Exh. AA.)

a department facility, the memo instructed personnel to contact their immediate supervisor or Internal Affairs. (*Id.*) Sprague testifies this was the first time he saw this type of briefing in 22 years. (Sprague Depo. 89:11–12.) OCSD disputes this testimony, as Chacon states that ordering an individual to stay away from department facilities was "standard when anybody is placed on administrative leave." (Chacon Depo. 171:1–20.)

The other conditions of Montoya's leave were that he had to remain home during working hours, and could only leave if he advised Internal Affairs. (Chacon Depo. 171:6–13.) An employee on administrative leave might have to use leave time for any period he was away from his residence. (*Id.* at 172:3–21.) When Montoya left his home to visit his fiancé's grave, OCSD charged him leave time. (Pl's Exhs., Exh. CC.) Montoya was also ordered not to contact OCSD personnel in regard to his case, nor to contact potential witnesses. (Chacon Depo. 171:14–21.)

While Montoya was on administrative leave, OCSD continued to investigate and track Montoya to determine if he was a threat. Pursuant to the rumors that Montoya had not been awarded the Navy Cross, Investigator Robert Taft sent a January 6, 2010 email to a Marine Corps address investigating whether these unconfirmed allegations could be substantiated. ("Taft Email," Pl's Exhs., Exh. DD.) Taft stated he was responsible for assessing the "possibility of Montoya committing an act of 'workplace violence' should he be terminated." (*Id.*)

### 9. Notice of Pending Dismissal and Termination

On September 2, 2010, Montoya signed his Notice of Pending Dismissal. ("Not.

Pending Dis.," Def's Exhs., Exh. 30.) The Notice states he was being dismissed for violating numerous Department rules and regulations pursuant to the conduct uncovered in the 2009 Investigations. (*Id.*) On October 8, 2010, Montoya was officially terminated, citing the same rules violations listed in the Notice. ("Term. Not.," Def's Exhs., Exh. 40.)

### III. LEGAL STANDARD [14]

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.*, 707 F.2d 1030, 1033 (9th Cir.1983). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Instead, the moving

---

**14.** Unless otherwise noted, all references to "Rule" refer to the Federal Rules of Civil Procedure.

party's burden is met by pointing out there is an absence of evidence supporting the non-moving party's case. *Id.*

The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.,* 627 F.3d 376, 387 (9th Cir.2010) (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505). "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle,* 627 F.3d at 387 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. *Barlow v. Ground,* 943 F.2d 1132, 1135 (9th Cir. 1991); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

## IV. DISCUSSION

### A. Scope of the Motions

Defendant's Motion seeks summary judgment on all of the claims in the FAC, including Plaintiff's allegations that: (a) Montoya was subject to a hostile work environment on account of his military service, (b) OCSD denied Montoya promotions and desired assignments based on his military service, and (c) OCSD initiated personnel investigations and eventually terminated him due to its pervasive animus against Montoya's military service and military accolades. Plaintiff's Motion seeks partial summary judgment on only the first of these claims for a hostile work environment.[15]

### B. USERRA

■■■ Plaintiff brings all of his claims under the Uniform Services Employment and Reemployment Rights Act of 1994 ("USERRA"), and specifically Section 4311 under the Act. USERRA, codified in 38 U.S.C. § 4301, et seq., represents Congress' most recent effort to provide job security for past, present, and future members of the country's armed services. *Petty v. Met. Gov't of Nashville–Davidson Cnty.,* 538 F.3d 431, 439 (6th Cir.2008).

The applicable statutory language under Section 4311 of USERRA provides that "A person who ... has performed ... service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that ... performance of service...." 38 U.S.C. § 4311(a). An employer violates subsection (a) if the employee's service "in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such ... service." 38 U.S.C. § 4311(c)(1).

---

15. Plaintiff's Motion does not seek summary judgment on his claim that OCSD's conduct was willful or on the issue of damages. (Pl's Mot. at 3; see FAC ¶ 20; at 4.)

Congress enacted USERRA as a response to the Supreme Court's decision in *Monroe v. Standard Oil Co.*, 452 U.S. 549, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981), wherein the Court held that USERRA's antecedent "was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations ... motivated solely by reserve status." *Id.* at 559, 101 S.Ct. 2510. USERRA broadened the statute by providing that a violation occurs when a person's military service is a "motivating factor" in the discriminatory action, even if not the sole factor. *See* 38 U.S.C. § 4311(c)(1); *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1012–13 (Fed.Cir.2001). Indeed, Congress explicitly stated that one of the purposes of USERRA was "to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301.

■■■■ "USERRA forbids employment discrimination on the basis of membership in the armed forces." *Townsend v. Univ. of Alaska*, 543 F.3d 478, 482 (9th Cir.2008). "Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 303 (4th Cir.2006); *see also Middleton v. City of Chicago*, 578 F.3d 655, 662 (7th Cir. 2009) ("USERRA is to be liberally construed."); *Clegg v. Ark. Dep't of Correction*, 496 F.3d 922, 930 (8th Cir.2007); *Hernandez v. Dept. of the Air Force*, 498 F.3d 1328, 1332 (Fed.Cir.2007).

### 1. USERRA's Burden Shifting Framework

■■■■ USERRA discrimination claims are analyzed under a burden-shifting mechanism. *See Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir.

2007); *Sheehan*, 240 F.3d at 1013. An employee who makes a discrimination claim under USERRA bears the initial burden of showing by a preponderance of the evidence that his military service was a substantial or motivating factor in the adverse employment action. *Erickson v. U.S. Postal Serv.*, 571 F.3d 1364, 1368 (Fed.Cir.2009); *Wallace*, 479 F.3d at 624. If the employee makes that prima facie showing, the employer can avoid liability by demonstrating, as an affirmative defense, that it would have taken the same action without regard to the employee's military service. *Erickson*, 571 F.3d at 1368; *Velazquez–Garcia v. Horizon Lines Of Puerto Rico, Inc.*, 473 F.3d 11, 17 (1st Cir.2007). An employer therefore violates Section 4311 if it would not have taken the adverse employment action but for the employee's military service or obligation. *See Erickson*, 571 F.3d at 1368 (citing H.R. Rep. No. 103–65, at 24 (1993), as reprinted in 1994 U.S.C.C.A.N. 2449, 2457); *see also Leisek v. Brightwood Corp.*, 278 F.3d 895, 898–99 (9th Cir.2002) (applying the "scheme of burden-of-proof allocations" to a district court's summary judgment in favor of the defendant-employer on a plaintiff's retaliation claim under § 4311).

### C. Denial of Positions and Initiation of Personnel Investigations

In his FAC, Plaintiff claims that due to his military service, OCSD failed to recognize him for promotions or properly consider him for desired assignments, and subsequently initiated the personnel investigations that led to his termination. Under USERRA's burden-shifting framework described above, Plaintiff must establish a prima facie case, "show[ing] by a preponderance of the evidence that his protected status was a motivating factor" in OCSD's decisions not to promote him, grant his assignment requests, or to initiate the in-

vestigations. *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir.2005).

◼ In its Motion, OCSD argues that Plaintiff offers no evidence to support his discrimination claims concerning denials of promotion and assignment or commencement of the investigations. Plaintiff's opposition fails to address OCSD's substantive arguments, and instead argues that Defendant's Motion should be denied because OCSD "failed to produce evidence that could have been used to establish those claims." (Pl's Opp'n at 17.) Plaintiff bases his argument on alleged discovery abuses, wherein OCSD "failed to preserve any relevant electronic discovery" by improperly implementing its litigation hold policy. (Pl's Opp'n at 17–18.) Specifically, Plaintiff contends that the Court should deny summary judgment on these claims because OCSD failed to send its litigation hold email to all employees, or at least all relevant employees, in compliance with its litigation hold policy. (*Id.* at 18–19.)

◼ In order to prove that an opposing party failed to preserve electronic records, a party must show: "(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind'; and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoilated evidence." *Surowiec v. Capital Title Agency, Inc.*, 790 F.Supp.2d 997, 1005 (D.Ariz.2011) (citation and quotation omitted); *see Apple Inc. v. Samsung Electronics Co., Ltd.*, 881 F.Supp.2d 1132, 1136 (N.D.Cal.2012); *In re Napster, Inc. Copyright Litig.*, 462 F.Supp.2d 1060, 1070–78 (N.D.Cal.2006). Plaintiff's argument pertains only to the third of these factors; he makes no argu-

ment with regard to the first or second considerations.

◼ As to the first factor, litigants have an obligation to preserve evidence from the moment that litigation is reasonably anticipated. *Apple*, 881 F.Supp.2d at 1136. OCSD sent out its litigation hold email on December 16, 2011, three days after Plaintiff filed his Complaint. (Pl's Opp'n Exhs., Exh. 15.) Plaintiff does not argue that OCSD's preservation duties arose before this date, and the Court finds that the hold timely preserved OCSD's evidence with respect to this litigation. *See Apple*, 881 F.Supp.2d at 1137 ("[W]hen a company or organization has a document retention policy, it "is obligated to suspend" that policy and "implement a 'litigation hold' to ensure the preservation of relevant documents" after the preservation duty has been triggered.") (citation and quotation omitted).

Plaintiff offers no evidence with regard to the requisite mental state. Instead, Plaintiff generally accuses OCSD of "indifference or ineptitude" because it allegedly ignored its own policy. (Pl's Opp'n at 19.) Even if OCSD could be found to have acted indifferently or ineptly, it would not rise to the level of "conscious disregard" required to award sanctions for a party's failure to preserve evidence. *Apple*, 881 F.Supp.2d at 1147 (citing cases). OCSD timely sent out its litigation hold email to twelve employees in charge of maintaining and preserving documents, including OCSD's IT Department. (Blackburn Decl. ¶ 2.) Shortly thereafter, OCSD searched both the active and archive systems for emails related to Plaintiff's Complaint. (*Id.* ¶¶ 2–3.) The Court cannot find that these actions show "conscious disregard" for OCSD's duties to preserve information relevant to this action. *Cf. Surowiec*, 790 F.Supp.2d at 1007 (finding a culpable state of mind where the party "complete[ly]

fail[ed] to suspend its ongoing destruction of emails and to capture the evidence on Mr. Romley's computer" for at least four months after it reasonably anticipated litigation).

Finally, Plaintiff must show that the evidence OCSD destroyed was relevant to its claims. Plaintiff does not identify anything OCSD destroyed that would have been relevant to this litigation. Plaintiff does not point to any piece of evidence or category of evidence he believes he is missing, nor does he identify any person from whom he thinks evidence should have been collected but was not. Plaintiff's bare assertion that the litigation hold email should have been sent to additional employees is insufficient to demonstrate that relevant evidence was destroyed, especially when those who received the email were in charge of electronic storage for all employees. (*See* Blackburn Decl. ¶ 4; Deposition of Ed Lee ("Lee Depo.") 17:18–22:21, Pl's Opp'n Exhs., Exh. 14.)

Based on the lack of evidence as to any of three factors, Plaintiff has failed to show that Defendant shirked its obligation to preserve relevant evidence. Thus, sanctions, including the denial of Defendant's summary judgment motion, are not warranted. *See Apple*, 881 F.Supp.2d at 1138 (citing *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001) ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis.")).

■ Even if sanctions were appropriate, the Court finds no basis for granting Plaintiff's requested sanction, that is, the denial of Defendant's Motion as to the promotion and personnel investigation claims so that he "can discover information that went unpreserved through examination of witnesses at trial." (Pl's Opp'n at 19.) Plaintiff had over two years to depose witnesses in order to discover information pertaining to his claims. In fact, Plaintiff took the deposition of at least seventeen OCSD witnesses and should have sought information pertaining to any documentary evidence he believes was improperly withheld during those depositions. (Rossiter Reply Decl. ¶¶ 11–12.) If Plaintiff failed to diligently pursue those discovery opportunities, that failure cannot now serve as a basis to oppose summary judgment. *See Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir.1986) (noting that the party opposing summary judgment "cannot complain if it fails to pursue discovery diligently before summary judgment"). Accordingly, Plaintiff's inability to uncover information supporting his claims for relief during discovery does not warrant denial of Defendant's Motion.[16]

Due to Plaintiff's failure to sufficiently establish any essential element of his USERRA promotion and personnel investigation claims, the Court GRANTS Defendant's Motion for Summary Judgment as to these claims.[17] Specifically, Plaintiff

---

**16.** It is important to note that Plaintiff does not seek a continuance of the discovery period pursuant to Federal Rule of Civil Procedure 56(f) in order to obtain evidence necessary to oppose Defendant's Motion. Fed. R.Civ.P. 56(f). *See Baird v. Alameida*, 407 F.Supp.2d 1134, 1139 (C.D.Cal.2005) (finding that plaintiff did not seek a discovery continuance where he "failed to file a motion under Rule 56(f) or even to present the Court with an affidavit detailing the specific facts he ex-

pects to uncover through discovery and how those facts might help him defeat summary judgment"). Instead, Plaintiff seeks denial of the Motion as a sanction for Defendant's failure to preserve unidentified evidence. (Pl's Opp'n at 17–18.)

**17.** At the June 24, 2013 hearing, Montoya argued for the first time that he met his burden to establish that his military service was a motivating factor in OCSD's decision to

has failed to present a triable issue of fact on his USERRA claims based on OCSD: extending his patrol training, denying his assignment to SWAT, denying his promotion to sergeant, failing to assign him to be a transit officer, terrorist liaison officer, or tactical training officer, and initiating the 2009 Investigations which led to his termination. Accordingly, these claims are dismissed with prejudice.

### D. Hostile Work Environment

Plaintiff's sole remaining claim alleges that he experienced harassment on account of his military service sufficient to rise to the level of a hostile work environment. Plaintiff alleges that OCSD is liable under USERRA for fostering a hostile work environment consisting of severe and pervasive harassment based on his protected status as a service member. (Pl's Mot. at 16; Pl's Opp'n at 8.) Both Plaintiff and Defendant seek summary judgment on this claim. The Court addresses their Motions together as they involve identical facts and arguments.

### 1. USERRA Protects Against Hostile Work Environments

Defendant argues that during the relevant time period USERRA did not allow for claims based on a hostile work environment. (Def's Mot. at 9.) Although Congress later amended USERRA to allow these claims, Defendant contends this amendment was not retroactive and therefore Plaintiff's claim, which accrued prior to the modification, is barred as a matter of law. (Def's Opp'n at 1–2.) Plaintiff counters that Congress' amendment was merely a clarification, not a change, and therefore he has, and has always had, the

ability to bring a harassment claim under USERRA. (Pl's Reply at 1–2.)

### a. Statutory Changes

As discussed above, USERRA protects service members from being denied "any benefit of employment" by an employer on account of their service. 38 U.S.C. § 4311(a). Prior to November 21, 2011, USERRA defined "benefit of employment" as "any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice. . . ." *Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 175 (5th Cir. 2011) *cert. denied,* — U.S. ——, 132 S.Ct. 369, 181 L.Ed.2d 235 (2011) (quoting 38 U.S.C. § 4303(2) (2010)). On November 21, 2011, Congress amended this definition to add that "benefit[s] of employment" include the "terms, conditions, or privileges of employment." 38 U.S.C. § 4303(2) (2011) [hereinafter "2011 Amendment"].

 The phrase Congress added— "terms, conditions, or privileges of employment"—directly mirrors the language under Title VII of the Civil Rights Act of 1964 under 42 U.S.C. § 2000e et seq. ("Title VII"). *See* 42 U.S.C. § 2000e–2 (making it unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, *terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin) (emphasis added). In 1986, the Supreme Court found that this language permitted a plaintiff to assert a hostile work environment claim in a Title VII case. *See Meri-*

---

sustain his personnel investigations and subsequently terminate him. However, the Court need not consider an issue raised for the first time at oral argument. *See Carroll v. Nakata-*

*ni,* 342 F.3d 934, 944 (9th Cir.2003); *Rice Corp. v. Grain Bd. of Iraq,* 582 F.Supp.2d 1309, 1313 (E.D.Cal.2008).

*tor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ("[T]he phrase terms, conditions, or privileges of employment in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.") (citation omitted). Since Congress is presumed to understand the legal import of words it uses in light of existing case law, *see Jeffries v. Wood,* 114 F.3d 1484, 1495 (9th Cir.1997) (en banc), the Court finds that by adding this particular phrase Congress intended to ensure that plaintiffs are able to bring hostile work environment claims under USERRA.

### b. Change or Clarification of USERRA

Defendant argues that because the "terms, conditions, or privileges of employment" language was missing from USERRA at the time his claim accrued, that is, prior to his termination in 2010, USERRA did not protect against hostile work environments. Defendant relies on the Fifth Circuit's decision in *Carder v. Continental Airlines, Inc.,* 636 F.3d 172 (5th Cir.2011), where the Court, examining the pre–2011 USERRA language, held that because this phrase was omitted from the USERRA statute, it did not incorporate a cause of action for hostile work environment. *Id.* at 177–79. Defendant further contends that because the language of the amendment does not require it, the 2011 Amendment does not apply retroactively.

Plaintiff disagrees with the premise of Defendant's argument. Plaintiff contends that, contrary to the *Carder* decision, USERRA has always provided for hostile work environment claims, and Congress' 2011 Amendment merely clarified, not changed, the law on this point.

Thus, the threshold issue is whether, prior to 2011, USERRA protected against hostile work environments. Although the Court finds *Carder's* reasoning persuasive, the Court defers to Congress's opinion that the 2011 Amendment was intended to clarify, not change the scope of USERRA, and thus hostile work environment claims have always been cognizable under USERRA.

First, the Court recognizes that neither the Supreme Court, nor the Ninth Circuit have indicated whether USERRA encompassed hostile work environment claims before 2011. *See Church v. City of Reno,* 168 F.3d 498, at *1 (9th Cir.1999) (unpub.disp.) (noting that "neither the Ninth Circuit nor the U.S. Supreme Court has interpreted ... USERRA ... to create liability for a hostile work environment"); *Mock v. City of Rome,* 851 F.Supp.2d 428, 433 (N.D.N.Y.2012) (confirming that the Supreme Court has not considered the issue and adding that the Fifth Circuit is the only circuit court to consider whether a hostile work environment claim was cognizable under USERRA prior to the 2011 Amendment). No district courts in the Ninth Circuit have addressed the issue either.

However, the Court does recognize that the Ninth Circuit has liberally construed USERRA to permit a plaintiff to proceed with a constructive discharge claim under Section 4312 of the statute. *See Wallace v. City of San Diego,* 479 F.3d 616, 624–25 (9th Cir.2007). The *Wallace* court specifically noted that "[a]lthough the term 'retaliation' is not used in USERRA, the gravamen of this section is to prohibit adverse employment actions taken in retaliation for the exercise of the rights provided by USERRA." *Id.* at 625 n. 1. *But see Church,* 168 F.3d 498 (declining to reach the issue of whether a hostile work environment claim is cognizable under the statute).

Moreover, contrary to the Fifth Circuit's opinion in *Carder*, several district courts have found that the unamended version of USERRA protected against hostile work environments. *See Dees v. Hyundai Motor Mfg. Alabama, LLC*, 605 F.Supp.2d 1220, 1227 (M.D.Ala.2009); *Maher v. City of Chicago*, 406 F.Supp.2d 1006, 1023 (N.D.Ill.2006); *Vickers v. City of Memphis*, 368 F.Supp.2d 842, 844 (W.D.Tenn. 2005); *Petersen v. Dep't of Interior*, 71 M.S.P.R. 227, 239 (1996); *Steenken v. Campbell Cnty.*, CIV.A. 04–224–DLB, 2007 WL 837173, at *3 (E.D.Ky. Mar. 15, 2007).

### i. Congress' Intent

 With this in mind, the Court looks to Congress' intent to determine whether the 2011 Amendment was designed to expand the scope of USERRA or merely to clarify the law as it existed pre–2011. As Defendant correctly notes, "retroactivity is not favored in the law." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 264, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (internal quotation marks omitted). However, courts "apply this time-honored presumption [against retroactivity] *unless Congress has clearly manifested its intent to the contrary.*" *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (emphasis added).

 When Congress amended USERRA, it clearly indicated that it did not intend to change or modify the law. Instead, Congress made it evident that it sought to clarify, rather than substantively change, existing law. When Congress plainly intends an amendment to be a clarification, as opposed to a modification, retroactivity analysis is inapplicable. *See ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 689 (9th Cir.2000) (noting that courts "have long recognized that clarifying legislation is not subject to any presumption against retroactivity"); *see also Dep't of*

*Toxic Substances Control v. Interstate Non–Ferrous Corp.*, 99 F.Supp.2d 1123, 1129 (E.D.Cal.2000) ("If the statute is a clarification, it "accurately restates the prior law" and there is no need for a [retroactivity] analysis because the statute has no retroactive effect."). In fact, clarifying legislation is assumed to apply retroactively. "The Ninth Circuit has consistently stated that when an amendment is a clarification, rather than an alteration, of existing law, then it should be used in interpreting the provision in question retroactively." *United States v. Innie*, 77 F.3d 1207 (9th Cir.1996) (quotation omitted).

 In order to determine whether the 2011 Amendment acted as a clarification of existing law, the Court examines the language of the statute in order to infer Congress' intent. *Jeffries*, 114 F.3d at 1495. Moreover, as noted above, Congress is presumed to understand the legal import of words it uses in light of existing case law. *Id.* at 1495. Notably, Congress entitled its 2011 amendment "Clarification of Benefits of Employment Covered under USERRA." VOW to Hire Heroes Act of 2011, Pub. L. 112–56, § 251, 124 Stat. 711, 729 (2011). In *Beverly Community Hosp. Ass'n v. Belshe*, 132 F.3d 1259 (9th Cir. 1997), the Ninth Circuit found that: "Given the extraordinary difficulty that the courts have found in divining the intent of the original Congress, a decision by the current Congress to intervene by expressly clarifying the meaning of [the statute] is worthy of real deference.... We therefore honor Congress' 'clarification' label and accept [the new] provisions as a statement of what [the statute] has meant all along." *Id.* at 1266. The *Beverly Community Hospital* decision is directly applicable here. Since Congress titled its 2011 Amendment a "clarification," the Court defers to Congress' label and accepts that the Amendment merely adds language to

show how the law originally was intended to operate. *See Meyerhoff v. United States Environmental Protection Agency,* 958 F.2d 1498, 1502 (9th Cir.1992); *Dep't of Toxic Substances Control,* 99 F.Supp.2d at 1133 ("Congress' use of the term 'clarification' three times in the operative liability provisions of the statute's text is strong evidence that it intended retrospective effect.").

■ Moreover, an amendment which resolves a dispute or ambiguity in the law, such as a circuit split, is an indication that the amendment is intended to clarify, rather than change, the existing law. *ABKCO Music,* 217 F.3d at 691 (quoting *Callejas v. McMahon,* 750 F.2d 729, 731 (9th Cir. 1984)). As noted above, while the *Carder* court found USERRA did not encompass hostile work environment claims, several district courts throughout the country came to the opposite conclusion. In addition, in July 2011, the U.S. Department of Labor issued its "USERRA Fiscal Year 2010 Annual Report to Congress" wherein it recommended that Congress "clarify that USERRA prohibits workplace harassment and the creation of a hostile working environment." Dep't of Labor, USERRA Fiscal Year 2010 Annual Report to Congress 18–19 (July 2011) ("Although the Department believes that the statute currently supports this reading, in light of the risk of contrary interpretations by the courts, the Department recommends that Congress consider clarifying [ ] USERRA"). Congress enacted the 2011 Amendment with the backdrop of the *Carder* decision and numerous contradictory district court opinions and the Department of Labor's recommendation to clarify. The recognized dispute in the law on this issue gives further support to the holding that the 2011 Amendment was designed to clarify, not change, USERRA. *See Callejas,* 750 F.2d at 731 (holding that a statute

clarified the law where it was amended after the Department of Health and Human Services opined on its interpretation and the district courts split on the issue).

■ Accordingly, the Court finds that the 2011 Amendment acted as a clarification of USERRA and thus should be used to interpret the statute retroactively. *See Means v. Northern Cheyenne Tribal Court,* 154 F.3d 941, 951 (9th Cir.1998) (Reinhardt, J. concurring), overruled on other grounds by *United States v. Enas,* 255 F.3d 662 (9th Cir.2001) (stating a clarification is a statement "of what [Congress] believed the law already was" and is applicable "to all cases, past, present and future"). The Court thus finds that Congress intended to clarify that USERRA has always provided a cause of action based on allegations of a hostile work environment. Plaintiff therefore may proceed with his hostile work environment claim in this action.

**2. Standing to Bring Hostile Work Environment Claim**

■ Defendant also curiously argues that Plaintiff does not have standing to bring a harassment claim because he does not seek a remedy available under USERRA. (Def's Mot. at 14.) Defendant points to the fact that USERRA provides three specific remedies for its violation, namely requiring the employer to comply, compensating the employee for any loss of wages or benefits, and liquidated damages if an employer's violation was willful. 38 U.S.C. § 4323(d)(1)(A–C). Defendant argues that Plaintiff does not allege that he suffered any lost wages or employment benefits as a result of the harassment. (Def's Mot. at 14–15.) However, Defendant ignores the fact that the statute also provides Plaintiff with an equitable remedy. *See* 38 U.S.C. § 4323(e). Just because an employee cannot establish that he or she suffered any

monetary damages does not mean the employee is without relief under USERRA. *See Hill v. Michelin N. Am., Inc.,* 252 F.3d 307, 316 n. 5 (4th Cir.2001). Thus, the Court may order injunctive relief, such as reinstatement or front pay, if Plaintiff is able to prove Defendant violated USERRA by perpetuating a hostile work environment. *See, e.g., Wriggelsworth v. Brumbaugh,* 129 F.Supp.2d 1106, 1109 (W.D.Mich.2001). Moreover, the statute provides that Plaintiff may be compensated for lost benefits, which as described above, include losses incurred from a hostile work environment. *See* 38 U.S.C. § 4303(2) (defining both "benefits" and "benefits of employment" to include the "terms, conditions, or privileges of employment").

■ Defendant also contends that Plaintiff cannot hold OCSD liable for harassment at the hands of co-workers. (Def's Mot. at 15.) It explains that since co-workers have no authority over Plaintiff, they did not deny him any benefit of employment, nor did they have any involvement in Plaintiff's employment decisions. However, to support this proposition, Defendant cites to two cases where the plaintiff asserted termination claims, not hostile work environment claims. *See Dees v. Hyundai Motor Mfg. Alabama, LLC,* 368 Fed.Appx. 49, 52 (11th Cir.2010) (alleging a termination claim); *Durant v. MillerCoors, LLC,* 415 Fed.Appx. 927, 930 (10th Cir.2011) (same). As discussed more fully below, in the context of a hostile work environment claim, an employer, such as OCSD, may be liable for the harassing actions of Plaintiff's co-workers. · *See Nichols v. Azteca Rest. Enterprises, Inc.,*

256 F.3d 864, 875 (9th Cir.2001) ("An employer is liable for the hostile work environment created by a co-worker. . . .").

Defendant has failed to present any arguments which demonstrate that Plaintiff lacks standing to bring a hostile work environment claim against OCSD.

### 3. Triable Issues of Fact

Having found that a harassment claim is cognizable under USERRA, the Court now turns to the viability of Plaintiff's harassment claim. Both Plaintiff and Defendant argue that OCSD's liability pursuant to Plaintiff's hostile work environment claim can be decided on the basis of the undisputed facts. The Court disagrees. Resolving Plaintiff's hostile work environment claim would require the Court to determine the credibility of witnesses and to weigh evidence, which it cannot do on summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The Court therefore must deny both parties' Motions on this claim.[18]

■ Because there is very little case law examining a hostile work environment claim in the context of USERRA, the Court incorporates the standards and case law used to evaluate hostile work environment claims under· Title VII. *See, e.g., Vega–Colon v. Wyeth Pharmaceuticals,* 625 F.3d 22, 32 (1st Cir.2010) (relying on Title VII precedent to analyze a USERRA hostile work environment claim); *Mock,* 851 F.Supp.2d at 433 (same); *Dees,* 605 F.Supp.2d at 1228 (same).

### a. Severe or Pervasive Harassment

■ To prevail on a hostile work environment claim, Plaintiff must establish "a

---

**18.** As discussed above in Section II.A.1.a, the Court finds that substantial portions of the personnel investigations are relevant, non-hearsay and admissible to demonstrate OCSD's motive. However, the Court finds that the pre–2009 investigations are not relevant or admissible to determine whether OCSD is liable for the harassment perpetrated by Montoya's co-workers.

pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir. 1998) (citation omitted). Plaintiff must prove that his workplace was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In addition, Plaintiff is required to show that any harassment took place on account of his protected status as a military service member. *See Vega–Colon*, 625 F.3d at 32.

### i. Objectively Offensive

In evaluating the objective hostility of a work environment, the factors to be considered include the "frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (quotation omitted). The required level of severity "varies inversely with the pervasiveness or frequency of the conduct." *Nichols*, 256 F.3d at 872 (citation and quotation omitted). Although it is clear that "[n]ot every insult or harassing comment will constitute a hostile work environment," "[r]epeated derogatory or humiliating statements ... can constitute a hostile work environment." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1115 (9th Cir.2004). The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Nichols*, 256 F.3d at 872 (citation and quotation omitted).

Here, Plaintiff puts forth evidence to show that he experienced harassing conduct by co-workers at OCSD and by executive and administrative staff. Plaintiff provides undisputed evidence of eleven incidents perpetrated by co-workers which occurred while he was stationed in Stanton. These incidents spanned approximately four years. Plaintiff also provides evidence from which a jury could find that incidents like these occurred frequently, "numerous times every day" "whenever [Montoya] was working." (Sprague Depo. 50:1–9.) The Court finds that given the frequency of these incidents, a reasonable juror could find that the sustained campaign of taunts directed at Plaintiff were sufficiently pervasive to alter the conditions of his employment. *See El–Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005) ("Although [co-worker]'s conduct may not have been especially severe, there was unrefuted evidence of its frequency and pervasiveness."); *see, e.g., Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir.2008) (series of incidents of co-worker exclusion, name-calling and insulting comments created a triable issue of fact on the issue of hostility); *Dominguez–Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir.2005) (reversing summary judgment where the "district court ignored [employee]'s testimony that [supervisor]'s graphic and sexually explicit jokes 'were like everyday jokes,' that [supervisor] said he would never work for a female 'so many different times,' and that [employee] 'could write a book about all the different [times]' Stacey said he did not 'feel that [the employee] or a female could go out into the field and do the work that a man is required to do.' "); *Nichols*, 256 F.3d at 873 (sustained campaign of taunts by supervisor and coworkers sufficiently hostile).

In addition to the specific incidents documented by Montoya, there is also undisputed evidence that Montoya was the subject of pervasive rumors in the Stanton station and beyond. Numerous co-

workers testified that they were aware of rumors about Montoya. These rumors included allegations that he received favorable treatment from OCSD's Sheriff, that he passed patrol training due to his military record, and that he lied about earning the Navy Cross. In conjunction with the incidents described above, the Court finds that this conduct is sufficient to survive summary judgment on the issue of whether the alleged conduct was objectively offensive. *See Salter v. Washington Twp. Health Care Dist.*, 112 Fed. Appx. 557, 559 (9th Cir.2004) (finding genuine issues of material fact on the issue of hostility after considering the "allegation of repetitive ridicule along with the other racially hostile incidents that Salter recounted as having occurred with coworkers," including the fact that "coworkers started a rumor that she and another African–American clerk 'stank' ").

Plaintiff also points to OCSD's conduct during the 2009 Investigations and Threat Assessment as evidence of departmental harassment.[19] While Plaintiff was on administrative leave, OCSD installed a surveillance camera outside Plaintiff's home, tracked Plaintiff's vehicles using GPS monitoring devices, and prohibited Plaintiff from entering OCSD facilities.[20] The Court finds that the undisputed facts demonstrate OCSD's intrusive conduct was such that a reasonable juror could conclude that Plaintiff was the subject of severe harassment which altered the conditions of his employment. *See Bushfield v. Donahoe*, 912 F.Supp.2d 944, 959 (D.Idaho 2012) ("While on disciplinary leave for forty-five days, Bushfield was subjected to

what could be viewed by a reasonable person as an intense, personally invasive investigation into the facts and circumstances of his PTSD disorder under the guise of investigating his truthfulness on a pre-employment questionnaire."); *Black v. City and County of Honolulu*, 112 F.Supp.2d 1041, 1051–52 (D.Haw.2000) (concluding that evidence of police department's 24–hour surveillance of female police employee without her permission and wiretapping of a pager amounted to sufficient evidence to raise a genuine issue of material fact regarding a retaliatory hostile work environment).

■ A working environment is abusive if "hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Davis*, 520 F.3d at 1095 (citation and quotation omitted). The Court finds that the repeated incidents perpetrated by Montoya's co-workers, the pervasive rumors, and the subsequent surveillance amounted to an objectively hostile environment which would have made it more difficult for a reasonable person to do his job and to continue in his employment.

### ii. Subjectively Hostile Environment

■ If the victim "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no [hostile work environment] violation." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The Court must determine

---

**19.** To the extent that Plaintiff relies on the Taft Email as evidence of departmental harassment, the Court does not consider the email here as Montoya was not aware of the email or its contents until after his termination and the commencement of litigation. (Nighswonger Depo. 116:7–8.)

**20.** There is also attenuated but undisputed evidence to show that OCSD seized the contents of Montoya's personal cell phone and called telephone numbers stored therein. (Aguilar Reply Decl. ¶ 2.)

whether Montoya's conduct indicated that the alleged harassment was "unwelcome." *Nichols,* 256 F.3d at 873.

■ Montoya's memos evidence his discontent with the frequent abuse he was receiving at the hands of his co-workers. In each memo, Plaintiff complained about the harassment and requested that OCSD administrators and supervisors investigate the acts, punish the offender, and end the abuse. These memos and Montoya's testimony reiterating the same demonstrate that he perceived his workplace to be hostile. *See Nichols,* 256 F.3d at 873 ("That Sanchez complained about the frequent, degrading verbal abuse supports our conclusion that the conduct was unwelcome.").

### iii. Because of Military Service

Despite the undisputed evidence demonstrating that Montoya experienced severe and pervasive harassment, the Court cannot grant summary judgment on the hostile work environment claim as to either party. Plaintiff must show that the harassment occurred "because of" the Plaintiff's protected status as a member of the military. *Nichols,* 256 F.3d at 874; *see* 38 U.S.C. § 4311(c)(1). Under USERRA, Plaintiff bears the initial burden of showing by a preponderance of the evidence that his military service was a substantial or motivating factor for his harassment. *See* 38 U.S.C. § 4311(c)(1); *Erickson,* 571 F.3d at 1368; *see also Univ. of Texas Sw. Med. Ctr. v. Nassar,* — U.S. —, 133 S.Ct. 2517, 2525, 186 L.Ed.2d 503 (2013) (defining the standard in the context of Title VII status-based harassment claims). The employer may avoid liability by demonstrating that the same actions would have occurred regardless of the employee's military service. *See* 38 U.S.C. § 4311(c)(1); *Erickson,* 571 F.3d at 1368.

The evidence regarding the nature and source of the harassment is substantially disputed. Plaintiff argues that all of the harassment stems from his military service and receipt of the Navy Cross. Plaintiff cites to specific incidents, namely the 1–800–NVY–CROS business card and the solicitation of Navy Cross hats for sale, to show that the abuse he suffered was based upon his military service. In addition, Plaintiff points to his own testimony as well as that of Deputy Sprague to connect his co-workers' actions to his military record. Finally, Plaintiff points to the Threat Assessment. Specifically, OCSD's presentation included bullet points related to his service and military training, and OCSD witnesses indicated that the Assessment was created in part because of concerns about post-traumatic stress which could lead Montoya to react to his termination violently.

However, Defendant's witnesses offer contrary evidence to show that the conduct resulted either from co-workers' dislike of Plaintiff or as a response to the personnel investigations and non-military service-based fear that Plaintiff would act violently after his discharge. Defendant points to Keller's testimony in which he describes his dislike and distrust of Montoya, and also to the fact that most of the incidents at Stanton did not implicate Montoya's service. Defendant also relies on the 2009 Investigations to show that OCSD employees and non-employees reported concerns about Plaintiff's instability and to show that Plaintiff was involved in multiple and continuous violations of OCSD policy, both of which arguably provided OCSD with reason to conduct the Assessment and engage in surveillance of Plaintiff unrelated to his status as a Marine. Finally, OCSD points out that many of the co-workers and supervisors that Montoya alleges harassed him are also military veterans, making it unlikely that they possessed any military animus.

■ Determining whether Plaintiff's service was a motivating factor in his harassment would require the Court to weigh evidence and evaluate the credibility of witnesses, which it cannot do on summary judgment. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987) (citations omitted) ("Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial."). Similarly, factual disputes and credibility determinations prevent the Court from evaluating Defendant's defense that Montoya would have experienced the same treatment regardless of his status as a veteran. Accordingly, the Court cannot find as a matter of law that Plaintiff's harassment occurred because of his protected status as a veteran of the Marine Corps and a Navy Cross recipient. For this reason, the Court DENIES Plaintiff's and Defendant's Motions on the hostile work environment claim.

### b. OCSD's Liability for the Harassment

■ Even if Montoya could prove that he was the victim of a hostile work environment based on his military status, OCSD is not necessarily liable for the harassment.[21] An employer's liability for harassment depends on whether the harassment was perpetrated by co-workers or supervisors. *See Vance v. Ball State Univ.,* —— U.S. ——, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013); *Nichols,* 256 F.3d at 875. "If the supervisor's harassment culminates in a tangible employment

action, the employer is strictly liable." *Vance,* 133 S.Ct. at 2439. Alternatively, an employer may be "vicariously liable for a hostile environment created by a supervisor, although such liability is subject to an affirmative defense.... If, however, the harasser is merely a coworker, the plaintiff must prove that ... the employer knew or should have known of the harassment but did not take adequate steps to address it." *McGinest,* 360 F.3d at 1119 (citations and quotations omitted); *see Vance,* 133 S.Ct. at 2441–42. If the undisputed facts demonstrate that OCSD cannot be liable for the harassment of which Montoya complains, then the Court must grant summary judgment in OCSD's favor.

#### i. Liability for Supervisors' Acts

■ The parties fail to adequately address which, if any, of the alleged acts were perpetrated by supervisors. An employer is strictly liable for the actions of a supervisor who takes a "tangible employment action" against a subordinate based on the employee's protected status. *Vance,* 133 S.Ct. at 2442. The parties do not address, and therefore the Court does not decide, whether any of the actions taken by OCSD personnel constituted "tangible employment actions" for which OCSD would be strictly liable. Alternatively, an employer can be held vicariously liable for actions by a supervisor "only when the employer has empowered that [supervisor] to take tangible employment actions against the victim." *Id.* at 2443. The Court finds that it does not have a sufficient factual record before it to determine whether the employees who allegedly

---

**21.** The parties incorrectly conflate the issues of harassment and the employer's liability for the harassment. As the Ninth Circuit noted. "a court must first assess whether a hostile work environment existed, and then determine whether the response was adequate as a whole." *McGinest,* 360 F.3d at 1119. Accordingly, OCSD's response to the alleged harassment is relevant to whether OCSD is liable, not to whether Montoya experienced a hostile work environment.

committed the acts of harassment were Plaintiff's supervisors, as defined in *Vance*.

In particular, the Court cannot determine whether a supervisor was responsible for the Threat Assessment and subsequent surveillance—which was conducted by OCSD Dignitary Protection Team, presented by Investigator Vega, and implemented by unknown individuals at OCSD. Given the complex supervisorial structure of OCSD and the parties' failure to address the issue of supervisory liability, the Court declines to reach the issue of whether the person or persons responsible for the Threat Assessment had the "authority to make tangible employment decisions" against Montoya. *Id.; see. McGinest*, 360 F.3d at 1119 n. 13 (holding that the "question of who was considered a supervisor by GTE, and whether its job categories suffice to satisfy the demarcations drawn under the case law interpreting Title VII is properly resolved by the district court on a more extensive factual record").

### ii. Liability for Coworker Acts

Nevertheless, a substantial portion of the events Montoya cites as harassment were allegedly committed by co-workers. Deputies Keller and Cullen, Montoya's co-workers, allegedly were responsible for a majority of the taunts Montoya experienced and all eleven of the incidents at Stanton were purportedly executed by co-workers.

 "[E]mployers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Dawson v. Entek Intern.*, 630 F.3d 928, 940 (9th Cir.2011) (citation and quotation omitted). OCSD had actual knowledge of many of the incidents at Stanton because undisputed evidence demonstrates that Montoya informed his superior either in person, by memo, or both. In many of the memos, Montoya specifically describes fellow deputies' conduct as "harassment" or "hostile." (*See* Dispatch Call Memo.; Business Card Memo.)

 Since OCSD had knowledge of co-worker harassment, it may only avoid liability by "undertaking remedial measures reasonably calculated to end the harassment." *McGinest*, 360 F.3d at 1120 (quotation and citation omitted). The reasonableness of the remedy is determined by its ability to "(1)stop harassment by the person who engaged in the harassment and (2) persuade potential harassers to refrain from unlawful conduct." *Id.* (citation and quotation omitted). Intervention must be prompt, include some disciplinary action, and be proportionate to the offense. *See id.; Dawson*, 630 F.3d at 940–41.

 Plaintiff contends that OCSD is liable for his co-workers' harassment because it failed to investigate most of the incidents Plaintiff reported and allowed the harassment to go unchecked. Plaintiff produced undisputed evidence of reports and memoranda he submitted to supervisors pertaining to many of the incidents at Stanton. In many cases, Plaintiff notified multiple superiors about the incidents, yet there is no evidence that any remedial measures were taken. In only two out of the eleven incidents—the MDC chat and a deputy's false statements to citizens about Montoya—is there any evidence that OCSD took corrective action. Despite the two reprimands given to Cullen and Keller, there is undisputed evidence that the taunts and teasing continued. When an employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment. *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1528–29 (9th Cir.1995). A reasonable ju-

ror could find that taking remedial action in only two instances that failed to end the harassment by those employees was not adequate. *See Nichols,* 256 F.3d at 876 (finding the employer liable for harassment by the employee's co-workers where "company made no effort to investigate Sanchez's complaint; it did not discuss his allegations with the perpetrators; it did not demand that the unwelcome conduct cease; and it did not threaten more serious discipline in the event the harassment continued").

██ Defendant's sole response to these facts is that disciplinary measures are confidential and Plaintiff cannot be aware if any were taken. Defendant cannot rely on an absence of facts to avoid liability since the burden is on Defendant to prove that it took adequate remedial measures. *See McGinest,* 360 F.3d at 1119 (describing evidence of remedial measures as an affirmative defense).

Accordingly, the Court cannot find as a matter of law that OCSD is not liable for the alleged harassment Montoya underwent at the hands of his co-workers. If a jury concludes that Montoya experienced a hostile work environment because of his protected status as a military veteran, the jury must further determine whether OCSD is liable for the acts of Montoya's supervisors and co-workers.

### 4. Liquidated Damages

██ Finally, OCSD seeks summary judgment on Plaintiff's request for liquidated damages. Under USERRA's remedy provision, the Court may require the employer to pay liquidated damages in an amount equal to the employee's actual damages, "if the court determines that the employer's failure to comply with the provisions of this chapter was willful." 38 U.S.C. § 4323(d)(1)(C). In the absence of any Ninth Circuit cases on point, courts in this district have imputed the liquidated damages standard from the Age Discrimination and Employment Act into a USERRA clam. *See Paxton v. City of Montebello,* 712 F.Supp.2d 1017, 1021 (C.D.Cal. 2010). Under this standard, a USERRA violation is willful "if the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* (citation and quotation omitted); *see also Fryer v. A.S.A.P. Fire & Safety Corp., Inc.,* 658 F.3d 85, 91 (1st Cir.2011) ("[T]he term 'willful' as used in § 4323(d)(1)(C) of USERRA refers to a knowing violation or action taken in reckless disregard of the obligations imposed by USERRA.").

██ Although there is no evidence in the record that OCSD knew of its obligations under USERRA, there is evidence from which a jury could conclude that OCSD was deliberately indifferent to its obligations under the statute. If a jury credits Plaintiff's version of the facts, it could find that OCSD's repeated indifference to Plaintiff's complaints of military harassment constituted a reckless disregard for its obligation to keep its workplace free of service-related harassment. *See id.* at 92. Since disputed issues of material fact remain as to OCSD's intent in its interactions with Montoya, the Court cannot grant summary judgment on the issue of willfulness.

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment and DENIES Plaintiff's Motion for Partial Summary Judgment.